**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Darnell L. WALKER (96–3073); William A. McKinley (96–3938), Defendants–Appellants.**

Nos. 96–3073, 96–3938.

United States Court of Appeals, Sixth Circuit.

Argued July 30, 1998.

Decided Nov. 19, 1998.

Linda M. Betzer, Asst. U.S. Attorney (argued and briefed), Office of U.S. Attorney, Cleveland, OH, for Plaintiff–Appellee.

Jacqueline A. Johnson, Fed. Public Defender (argued and briefed), Federal Public Defender's Office, Cleveland, OH, for Defendant–Appellant in docket No. 96–3073.

William T. Doyle (argued and briefed), Cleveland, OH, for Defendant–Appellant in docket No. 96–3938.

Before: JONES, RYAN, and MOORE, Circuit Judges.

RYAN, Circuit Judge.

The defendants, Darnell L. Walker and William A. McKinley, appeal from the judgments of conviction and sentences imposed following a jury trial on various drug and firearm charges in connection with a conspiracy to distribute cocaine and cocaine base in Youngstown, Ohio. The appeals present numerous issues, none of which warrant setting aside the defendant's convictions. We will, therefore, affirm both defendants' convictions, and Walker's sentence. We conclude, however, that McKinley's sentence must be vacated because the district court clearly erred in finding that McKinley was a leader of the conspiracy.

## I.

Between April and October 1993, Walker and McKinley were members of a Youngstown, Ohio, gang known as the Ready Rock Boys. The *raison d'être* of the Ready Rock Boys was the processing and distribution of cocaine and cocaine base, also known as "crack." The defendants, along with nine others, were named in a 13–count indictment handed down in January 1994, charging them with conspiracy to possess cocaine and cocaine base with the intent to distribute, in violation of 21 U.S.C. §§ 846, 841(a)(1). The indictment alleged that various codefendants sold cocaine or cocaine base in furtherance of the conspiracy, in a total amount of 25.2 grams of cocaine and 175.2 grams of cocaine base.

Walker was also charged with one count of possessing cocaine base with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B); two counts of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g), 924(a)(2); and one count of using and carrying a firearm during and in relation to a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1). McKinley was charged with an additional count of possessing cocaine base with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), 842(b)(1)(B).

Walker and McKinley proceeded to trial and, in September 1994, were convicted on all counts. Walker's conviction under 18 U.S.C. § 924(c)(1), however, was dismissed prior to sentencing, following the Supreme Court's decision in *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). Both defendants filed timely appeals.

## II.

### A. Juror Bias

#### 1.

Immediately following the return of the jury's verdict finding the defendants guilty, counsel for defendant McKinley moved for a mistrial. The motion was made to U.S. District Judge Solomon Oliver, as Judge George White, who had presided over the trial, was unavailable at the time the verdict was returned. The motion contained four separate grounds, only one of which is at issue here;

[W]ith regard to the individual jurors, during the course of the proceedings Judge White had requested that I speak to my client, Mr. McKinley, because [Judge White] was approached by a member of the jury, and the member of the jury is seated in the seventh seat, which would be the back row, all the way to the left, an African American woman, who made a statement to the Judge that she felt un-

comfortable because she was in the same elevator with my client previously.

Judge White had asked me to speak to my client. I assured the Judge that I was present during that time, we both were on the elevator. I got off before my client and remained on the elevator with her.

During the course of closing arguments, and also during the course of the trial, that juror ... was often seen making a series of facial expressions and rolling her eyes, and things like that, which brought to mind the fact she was either predisposed or was not paying attention to the facts before her.

McKinley's attorney added that "Judge White [had] addressed [him] off the bench and off the record, and at that time just indicated that the juror had made that statement to him." The attorney had not thought "anything of it at the time because ... [he] was present [in the elevator], there was no conversation; but in light of the fact of the rest of that particular juror's attitudes and demeanors in the case, ... [he now] believe[d] that those culmination of facts have caused her to rule against [his] client or otherwise have a predisposition towards conviction."

We note that McKinley's attorney's statement is somewhat ambiguous as to who got off the elevator, and whether McKinley was at any point left alone with the juror. Since, however, McKinley's attorney affirmatively stated that there was "no conversation" with the juror, and since, in a post-trial proceeding on another matter, McKinley testified that he had no "contact" with the juror, we presume that the attorney simply misspoke in suggesting that his client had been left alone with the juror.

Walker's attorney joined the motion for mistrial, noting: "This is the first that I have heard about any problem with your Mr. McKinley and a juror." He elaborated:

Your Honor, I had no knowledge of this incident ..., and I am greatly troubled by it, and I ask that judgment on this verdict be withheld until Judge White returns to the bench and can consider it more fully, in light of the speed in which the verdict was returned, and the participation of this juror in that verdict.

Judge Oliver denied the defendants' motion, stating:

[Judge White] spoke to [McKinley's attorney], but he obviously didn't feel on the basis of the comments which he received at that time that those were sufficient to declare mistrial or to take other steps.

And so I feel compelled at this point, in the light of my hearing what you describe here, to let the verdict stand.

I really don't think that a strong enough case has been made to overturn the verdict or to withhold the verdict pending further inquiry by Judge White, but you have made your record. I think you are entitled to make that.

Although McKinley later filed a motion for new trial, he did not rely upon this incident as a basis for his requested relief; Walker never filed any motion at all.

The record reveals that the elevator incident was preceded by another juror-contact incident that resulted in one juror's dismissal. That juror also was dismissed from the jury at the request of the AUSA, over the defendants' objections, on the basis of her admitted discussions regarding the trial with a friend who had been driving her to and from the trial, as well as watching it himself as a spectator. On this occasion, the district judge had held a hearing in chambers and thoroughly questioned the juror, as well as her friend, to ascertain the extent of the prejudice. The court then ruled that it would remove her "out of an abundance of caution."

### 2.

Both defendants contend that the trial judge's handling of the juror complaint concerning the elevator incident requires the conviction to be overturned. Specifically, Walker argues that the *ex parte* communication between the trial judge and the juror, and the trial judge and McKinley's counsel, violated his right to a fair trial by impartial jurors, his right to be present at all stages of the trial, and his right to effective assistance of counsel. He also contends that, because the district court failed to inquire on the record into the juror's state of mind, Walker was deprived of any opportunity to show

actual bias. McKinley characterizes the problem as one of "outside influence" on a juror, and improper juror contact, that denied him the right to an impartial jury. He argues that when a defendant alleges that an unauthorized contact with a juror has tainted a trial, a hearing must be held.

■ It is a "'basic requirement of due process'" that a "defendant in a criminal case receive 'a fair trial by a panel of impartial, "indifferent" jurors.'" *Rigsby,* 45 F.3d at 122 (quoting *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)). The landmark case on the topic of jury taint is *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), where the Court "affirmed that juries in criminal cases must be free of outside influences and announced the procedure to be followed when a party alleges that a jury has been subjected to such influences," *Rigsby,* 45 F.3d at 122–23, namely, the holding of a hearing "'with all interested parties,'" rather than *ex parte* resolution of the problem by the judge, *id.* (quoting *Remmer,* 347 U.S. at 229–30, 74 S.Ct. 450).

■ At the outset, we reject the government's argument that Walker is not an "interested party" with standing to complain here. The government argues that the incident involved McKinley only, not Walker. It is clear to us, however, that were we to conclude that the incident resulted in some prejudice to McKinley, the possibility of spillover for McKinley's alleged coconspirator would be palpable. We conclude, therefore, that Walker has sufficient interest in this incident to have standing to complain.

We have articulated four points to consider in cases of possible improper juror contact:

... (1) when a defendant alleges that an unauthorized contact with a juror has tainted a trial, a hearing must be held; (2) no presumption of prejudice arises from such a contact; (3) the defendant bears the burden of proving actual juror bias; and (4) juror testimony at the "*Remmer* hearing" is not inherently suspect.

*United States v. Rugiero,* 20 F.3d 1387, 1390 (6th Cir.1994) (citations and footnotes omitted). In *Rugiero,* we emphasized that it is the defendant's obligation to "prove[ ] ... actual bias ... on the part of the jury ..., [or to demonstrate] 'actual prejudice.'" *Id.* at 1391. And the rule established in *United States v. Rigsby* is that "[w]hen there is a *credible allegation of extraneous influences,* the court must investigate sufficiently to assure itself that constitutional rights of the criminal defendant have not been violated." 45 F.3d 120, 124–25 (6th Cir.1995) (emphasis added). But a district court is not obligated to conduct a hearing on every allegation of jury taint, because "not all communications with jurors warrant a hearing for a determination of potential bias." *Rigsby,* 45 F.3d at 124. And a defendant who waits until appeal to request a hearing bears a heavy burden, since the defendant has thereby effectively deprived this court of any basis for concluding that a hearing would be necessary, and asks us to presume that the district court would not have acceded to such a request, and would have done so for erroneous reasons. *See United States v. Griffith,* 17 F.3d 865, 880 (6th Cir.1994); *United States v. Walton,* 908 F.2d 1289, 1296–97 (6th Cir. 1990); *cf. United States v. Walker,* 1 F.3d 423, 430–31 (6th Cir.1993).

■ We first conclude that the district court mishandled this incident. At a minimum, the court should have informed Walker's counsel of the incident and then allowed all counsel to make a record of their objection, if any. The court should then have declared whether it thought a hearing was necessary, and if not, why not. We suspect that the court handled the juror complaint as it did largely because it assessed the complaint as having *de minimis* significance. The court handled the first incident of alleged juror bias in textbook fashion; clearly, then, the court was aware of the appropriate process and was not disinclined to employ it when necessary.

In all events, we are satisfied that the court's failure to handle the incident more carefully was harmless under the circumstances, because there is simply nothing in this record that leads us to conclude that the elevator incident created a danger of juror bias. There is no evidence of actual "contact" or "communication," and the district

court would therefore have been well within its discretion in declining to hold a hearing even if one had been requested. The defendants' failure to develop an adequate record compounds their problem. Both had the opportunity to request a hearing, and neither did so; McKinley had the chance to ask for a hearing at the time of his counsel's *ex parte* conference with the district judge, and it was open to Walker to make such a request, following the verdict, when he learned of the incident. We note too that neither party filed a motion for a new trial on this basis. For these reasons, we conclude that the district court's handling of this incident does not provide a basis for reversal.

## B. Sufficiency of the Evidence

■ McKinley challenges his conviction on the conspiracy count on the ground that there was insufficient evidence that he was a Ready Rock Boy. He may well be correct, but being a Ready Rock Boy is not a crime. However, conspiring to distribute cocaine is, and the record contains an enormous amount of evidence linking McKinley to the drug sales that were at the heart of this conspiracy, as well as evidence linking McKinley to other cocaine distributors who *were* members of the Ready Rock Boys. For example, in July 1993, a confidential informant purchased cocaine base, or crack, from McKinley at McKinley's home. The day prior to this successful sale, the CI had gone to McKinley's home, as he and McKinley had previously arranged; McKinley was not home, but codefendant Tariton Callier was there, and Callier sold crack cocaine to the CI. In August 1993, the CI again purchased crack from McKinley at McKinley's home; while the CI was there, McKinley telephoned codefendant Richard Edwards, arranged to buy some crack, went to Edwards's house to get the crack, and returned and sold it to the CI. Later in August, the CI again went to McKinley's house to buy crack; McKinley was not there, but codefendants Walker and Edwards were. Edwards then went to his own house and returned with an ounce of crack. And the CI purchased crack from McKinley on three more occasions in late August and early September.

McKinley pins all his hopes on the testimony of one government witness, Willie Shep-

herd, a member of the Ready Rock Boys, who testified that McKinley was not a member of the group. Shepherd testified that other members of the Ready Rock Boys were defendant Walker, Brian Hunter, Aaron Rogers, Tariton Callier, Richard Edwards, Andre Rodriguez, and Rodney Johnson; when asked directly by McKinley's attorney, Shepherd testified that McKinley was "not a member of the Ready Rock Boys." We note that of the other people identified by Shepherd as Ready Rock Boys, all but Johnson—and Shepherd himself—were named in the indictment here. We further note that in addition to not identifying McKinley as a Ready Rock Boy, Shepherd did not mention indicted defendants Benjamin Parker, Michael Donley, Tracy Wilks, or Matthew Patterson, all of whom pleaded guilty.

Shepherd's testimony that McKinley was not a Ready Rock Boy was not uncontradicted. At least one other witness, Jackie Bennett Johnson—mother of codefendant Richard Edwards—testified that McKinley *was* a member of the Ready Rock Boys. Further, Shepherd did not claim that McKinley was unknown to him; he identified government surveillance photos showing Edwards's car parked in front of McKinley's house; Edwards's car parked next to McKinley's car; and Edwards standing next to his car in front of McKinley's house. Shepherd also testified that McKinley sold drugs, although Shepherd claimed never to have bought drugs from him.

■ The essential elements of conspiracy under 21 U.S.C. § 846 are (1) an agreement by two or more persons to violate the drug laws, and (2) knowledge of, intention to join, and participation in the conspiracy on the part of each conspirator. *See United States v. Elder,* 90 F.3d 1110, 1120 (6th Cir.), *cert. denied,* — U.S. —, —, 117 S.Ct. 529, 993, 136 L.Ed.2d 415, 873 (1996). As we have on many occasions explained, we review a defendant's claim of insufficient evidence by evaluating the evidence in the light most favorable to the government, and by drawing all inferences and resolving all credibility disputes in the government's favor. *See United States v. Riffe,* 28 F.3d 565, 567 (6th Cir.1994). Our task is simply "to determine

whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *Id.; see Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Thus, McKinley's task is a daunting one, but even if it were less so, his argument would be unsuccessful. Assuming *arguendo* that the evidence indisputably proved that McKinley was not a member of the Ready Rock Boys, that fact fails to establish that McKinley was not in a conspiracy with members of the Ready Rock Boys. The indictment did not charge McKinley with conspiring to be a member of the Ready Rock Boys, which, as we have said, is not a federal crime; it charged him with conspiring to possess cocaine and crack with the intent to deliver. And there was ample evidence to convict him of that. There is no question that he sold drugs on numerous occasions. There also is no question that other members of the conspiracy were at times with him while he sold drugs, and at times sold drugs to him to enable him to sell to others, and at times sold drugs without him while at his house. And there is no question that he was familiar with many members of the Ready Rock Boys, and that he had their names and numbers in his address book. In short, there can be no serious dispute that there was a surfeit of evidence supporting the jury's verdict against McKinley, not an insufficiency.

## C. *Old Chief*

### 1.

Walker challenges the government's method of proving the prior-conviction element of his two felon-in-possession charges under § 922(g)(1), contending that there was a violation of the rule announced in *Old Chief v. United States,* 519 U.S. 172, 117 S.Ct. 644, 647, 136 L.Ed.2d 574 (1997).

For at least two decades, it was the rule in this court and elsewhere that "the government is not required to accept the defendant's offer to stipulate that he is a convicted felon in lieu of presenting evidence of defendant's prior felony convictions." *United States v. Yannott,* 42 F.3d 999, 1007 (6th Cir.1994) (citing *United States v. Burkhart,* 545 F.2d 14, 15 (6th Cir.1976)). All that was changed last year, however, when the Su-preme Court held that a district court abuses its discretion when it refuses a defendant's offer to stipulate as to a prior offense in a firearm felon-in-possession case, if the prior conviction raises the risk of improper considerations by the jury, and if the only rationale for admitting the offense is to prove that the defendant meets the relevant criterion of 18 U.S.C. § 922(g)(1). *See Old Chief,* 117 S.Ct. at 647. In *Old Chief,* the defendant had previously been convicted of assault causing serious bodily injury. He offered to stipulate to that fact but the prosecution refused, and the district court allowed the prosecution to introduce the order of judgment and commitment for Old Chief's prior conviction. Old Chief was ultimately convicted of violating 18 U.S.C. § 922(g)(1). ´ *Id.*

The basis for the dispute was Fed.R.Evid. 403, which provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

In reversing the conviction, the Supreme Court observed that convicting a felon of unlawful possession of a firearm merely because the prior conviction established a tendency to disobey the law would be an impermissible basis for the verdict. *Id.* 117 S.Ct. at 650. Next, the Court opined that a court's probative-value/unfair-prejudice calculation should be informed by the available alternatives. If an equally probative, but less unfairly prejudicial, item of evidence is available, then it should be substituted. *Id.* at 652. The evidence at issue in *Old Chief* had a clear risk of unfair prejudice, and the alternative—a stipulation that the defendant had been convicted of a crime punishable by more than one year's imprisonment—would have been equally probative in terms of proving the elements of the crime charged. Although the prosecution has a general right to "tell its story" and, within limits, introduce the type of evidence it sees fit, that right has "virtually no application when the point at issue is a defendant's legal status, dependent on some judgment rendered wholly indepen-

dently of the concrete events of later criminal behavior charged against him." *Id.* at 654–55. Further, such a stipulation would mitigate the danger of unfair prejudice. *Id.* at 653.

▮ In this case, Walker was charged with two violations of section 922(g). One count charged him with possessing, on April 30, 1993, "a Dan Wesson .357 caliber revolver, Serial Number 232360, which had been shipped in interstate commerce," after having been convicted of a felony on April 22, 1993. A second count charged him with possessing, on May 21, 1993, "a 9mm Ruger semiautomatic handgun, Serial Number 302–45136, which had been shipped in interstate commerce," having earlier been convicted of the same April 22, 1993, felony.

To meet its burden of proving that Walker had in fact been convicted of a felony on April 22, 1993, the government called as a witness Donald DeCarlo, an Ohio parole officer. The first question of substance asked of DeCarlo by the government was whether he could "explain . . . the difference between probation and parole." Counsel for Walker objected:

> Your Honor, I understood the reason for calling this witness was the government wanted to introduce my man's convictions because of the counts alleging that he was a felon in possession of a gun which had traveled in interstate commerce.
>
> Usually that is done by simply bringing someone in with the journal entries or the conviction, and that's it.
>
> Now it appears that the government has as its purpose all kinds of prejudicial things about probation, about parole, and about other things that are prejudicial and not relevant, and certainly far more prejudicial than probative under Rule 403.
>
> · *If you want a stipulation that my man has been convicted, I'll stipulate he's been convicted.* I won't stipulate as to the constitutional validity of it, but for purposes of this proceeding as to the count under which he's charged, I am willing to stipulate.
>
> But I don't think it is proper for the government to bring in, in the guise of someone bringing in records of a conviction, to bring in someone to start expound-

ing on the difference between probation and parole, how he knows this person, the fact that he was under supervision, and all the rest of it.

(Emphasis added.) As the colloquy at the bench continued, Walker's counsel again offered:

> You want a stipulation that he was convicted, I am willing to give it, or if you want to bring in a record custodian from Mahoning County Common Pleas Court, or whatever other court was the court of conviction, that's fine; but to bring all this in under the guise of simply showing that he was convicted, I feel, is far more prejudicial than it has to be.

And when the AUSA objected to the difficulty in proving the conviction in other fashions, Walker's counsel again offered: "Well, the sole question is not simply the expediency. I will stipulate that's the man, if that's what makes the whole thing."

The objection was ultimately overruled. DeCarlo's very brief testimony established that he knew Walker because he supervised him while Walker was "on probation in Mahoning County by two different courts for felony offenses." He further testified that Walker was convicted in April 1993 of "aggravated trafficking in drugs and possession of criminal tools."

▮ Clearly, under *Old Chief,* the court's decision to admit DeCarlo's testimony rather than accept Walker's stipulation was error. The question is whether it was harmless. *See United States v. Daniel,* 134 F.3d 1259, 1262–63 (6th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 83, 142 L.Ed.2d 65, 1998 WL 221491 (1998). "[I]t is well settled that an error which is not of constitutional dimension is harmless 'unless it is more probable than not that the error materially affected the verdict.'" *Id.* at 1262 (quoting *United States v. Fountain,* 2 F.3d 656, 668 (6th Cir.1993)). When the other evidence of guilt, apart from the evidence admitted in violation of Rule 403, is overwhelming, the Rule 403 error is rendered harmless. *See Thomas,* 49 F.3d at 259.

**2.**

■ "In order to convict under § 922(g)(1), the Government must prove the following three elements: ' "(1) that the defendant had a previous felony conviction, (2) that the defendant possessed a firearm, and (3) that the firearm had traveled in or affected interstate commerce." ' " *United States v. Kincaide,* 145 F.3d 771, 782 (6th Cir.1998) (citations and internal quotation marks omitted). In this appeal, Walker takes the position that the evidence with respect to one felon-in-possession count was otherwise very weak, specifically with respect to the possession element of the charge, and that therefore, the alleged *Old Chief* violation was not harmless. Walker does not specifically acknowledge that there were *two* felon-in-possession counts, but his argument is directed solely at the evidence offered with respect to the offense alleged to have occurred on May 21, 1993. We therefore presume, for the sake of this issue at least, that he concedes that the evidence with respect to the April 30, 1993, offense was overwhelming.

■ The government presented evidence that on May 21, 1993, a search warrant was executed at the home of Jackie Bennett Johnson, the mother of codefendant Edwards. Johnson cooperated with officers, agreeing to call her supplier and to enter a code indicating that she had $1,000 with which to purchase cocaine. She did so, and about 20 minutes later, Walker arrived at the home in a white Buick Regal; accompanying him was his sister, and she remained seated on the passenger side of the front seat as Walker parked and exited. As Walker began to walk up the driveway, he saw the police and fled on foot, successfully eluding arrest.

One officer, John Kelty, testified at trial that while some officers chased Walker, he and another officer approached the car from the driver's side. As Kelty stood next to the officer he was with, he observed the officer "remove[ ][a] handgun from the front seat of the white Buick." Kelty testified that the handgun "was right on the front seat, in plain view"; apparently, however, Kelty himself did not see it, and was simply told this by his fellow officer. Kelty also testified that the front seat was a bench-style seat with no divider in the middle. Kelty identified government exhibit 5/21–3 as "the handgun [his fellow officer] removed from the white Buick."

Walker's sister told a completely different story. She testified that she saw the officer "holding [a gun] inside of the car," but that she "didn't see where it came from," and she "guess[ed]" that "[h]e had it with him." As her testimony developed, however, it became clear that the gun she was referring to was not the same gun the police found. She claimed that the gun the police officer had been holding was "[s]omething like an AK," "you know, like a long machine gun or something, one of them kind of guns," "a policeman's gun." And she claimed that one police officer got in the car with her, and drove her "around the block" while he "talk[ed] on the radio"; she estimates that this episode lasted "like [an] hour and a half." The officer then "ask[ed][her] did Darnell have any drugs or any guns or anything," to which she answered no. She further testified that she did not see Walker with any guns that day, but that when she was finally allowed out of the car, "they went to search the car [and] he found a gun in the car." She claimed that the seats were separate, and that the gun was found in an armrest between the two seats. She also testified that she did not bring any guns into the car that day, and that any gun that was found did not belong to her. Finally, she testified that the car belonged to Walker's girlfriend, not to Walker.

"It is well established that proof of either actual or constructive possession is sufficient" under section 922(g). *Daniel,* 134 F.3d at 1263. "Moreover, both actual and constructive possession may be proved by circumstantial evidence." *Id.*

> "Constructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." Proof that "the person has dominion over the premises where the firearm is located" is sufficient to establish constructive possession.

*Kincaide,* 145 F.3d at 782 (citations omitted).

We conclude that the quantum of proof against Walker was sufficiently strong that,

as articulated in *Daniel*, it is probable that the *Old Chief* error did not materially affect the verdict. Indeed, the evidence that Walker constructively possessed the firearm is overwhelming. There is strong evidence that the firearm was found in the car, over which it is indisputable that Walker exercised dominion. True, Walker's sister suggested that the officer planted the gun, but her explanation of events is, at best, vague and ambiguous, and unlikely to be persuasive to any jury. This is not a case where there is some objective evidence, or even disinterested testimony, supporting a conclusion that the officer was lying. Thus, we conclude that the *Old Chief* error that occurred was harmless in its effect.

### D. Ineffective Assistance of Counsel

#### 1.

In March 1995, following trial but prior to sentencing, McKinley's trial attorney wrote a letter to the trial judge that read in relevant part as follows:

> The case was last called for Sentencing on February 22, 1995 at 9:30AM. At that time, I learned that the Government had called a gentleman named Damon J. Robinson to testify against Mr. McKinley at Sentencing, presumably based on some sort of alleged criminal activity. You will recall that I represent Mr. Robinson in two (2) separate criminal matters.... Due to the obvious conflict of interest of representing one client (Mr. McKinley) whose credibility and character would be "attacked" by another witness (Mr. Robinson), my services were terminated by Mr. McKinley.

McKinley accordingly retained new counsel in connection with his sentencing.

At the sentencing hearing, Robinson testified that he bought cocaine from McKinley on "consignment," beginning in approximately 1990. He also testified that in 1992, he went with McKinley to New York, where they met a man named Eddie in the South Bronx. They stayed overnight in a hotel room while they were "waiting for the transaction to go through for the cocaine." Robinson ended up bypassing McKinley entirely, and dealing directly with Eddie. He also testified that McKinley had two cars with secret compartments that McKinley used for storing cocaine. Apart from that, Robinson's testimony was extremely sketchy; he was obviously reluctant to provide any information about McKinley, and would not firmly state that he knew McKinley to be "competition" in the Youngstown cocaine market, and did not name any of McKinley's suppliers, customers, or associates.

Following the sentencing hearing but prior to the imposition of a sentence, McKinley filed a motion for a new trial, on the ground that his attorney at trial "was also counsel for an individual by the name of Damon J. Robinson who gave incriminating statements in regard to my case." The district court held a hearing, at which McKinley's trial attorney testified that he represented Robinson in connection with an FBI interview in January 1993, but that he was not present during the interview. However, the attorney was aware that "Mr. Robinson made a statement discussing a person named B.D. Parnell, who [the attorney] did not know or meet at that point, and it only came to light later on during the trial of this case that B.D. Parnell and B.B. McKinley were both nicknames or aliases or street tags, whatever, for William A. McKinley." The attorney testified that he learned of this sometime before the jury was impaneled, but that he did not share the information with McKinley: "I didn't see any relevance between Mr. Robinson and this statement ... and Mr. McKinley in the trial of this action."

> [T]he alleged involvement between Robinson and McKinley, for one, it preceded the scope of the conspiracy, [of] which Mr. McKinley was convicted, and number two, ... I didn't tie the two together. I didn't even remember Robinson's statement to the authorities about McKinley.
>
> Moreover, even if [I] had, the only thing that that could possibly have done was to provide intelligence. It certainly didn't go to proof of any crime. It would have been a dry conspiracy for Robinson to come, take the stand, and say, "Yes. I dealt drugs with B.B. McKinley."

He elsewhere emphasized that although he learned prior to trial that Parnell was an alias for McKinley, that did not serve to jog

his memory, and he simply had no recollection of the statement that Robinson had given. He testified that "the first time [he] became aware of a conflict is when Damon Robinson came walking through these doors as a government witness at sentencing."

The court denied McKinley's motion for a new trial, concluding first that the attorney had not been actively representing dual interests, because he did not even recall Robinson talking about McKinley. Second, the alleged conflict had no adverse effect on the attorney's representation, which was "very vigorous."

**2.**

McKinley argues now that his trial attorney had a conflict of interest that rendered his representation ineffective, taking the position that his attorney in effect jointly represented McKinley and Robinson. Whether the facts in a particular case give rise to a conflict of interest is a mixed question of fact and law that we review *de novo*. *See United States v. Hopkins*, 43 F.3d 1116, 1119 (6th Cir.1995).

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Court established a two-part test for assessing ineffective-assistance claims. The first prong of this test—the showing of deficient performance—is an objective one: "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88, 104 S.Ct. 2052. The Court pointed to "certain basic duties" inherent in the representation of a criminal defendant, among them a "duty of loyalty" to the client, from which derive "the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Id.*

The *Strickland* Court then turned to a consideration of the second, "prejudice" prong of its test, noting that even professionally unreasonable errors do "not warrant setting aside the judgment of a criminal proceeding if the error[s] had no effect on the

judgment." *Id.* at 691, 104 S.Ct. 2052. Except in certain limited circumstances, "ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." *Id.* at 693, 104 S.Ct. 2052. But one of those circumstances is that claimed by Walker to exist here: when a defendant can "demonstrate that an actual conflict of interest adversely affected his lawyer's performance," *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), he "need not demonstrate prejudice in order to obtain relief," *id.* at 349–50, 100 S.Ct. 1708; *see Strickland*, 466 U.S. at 692, 104 S.Ct. 2052.

There is not a shred of persuasiveness in McKinley's argument. He has not pointed to any evidence that his attorney was actively representing conflicting interests, given that, during trial, the attorney had no recollection whatsoever of Robinson's statement implicating McKinley. *See Hopkins*, 43 F.3d at 1119. McKinley has not, alternatively, pointed to any evidence that the attorney's performance was in any other way deficient, and has not identified any evidence suggesting that he was prejudiced by his attorney's performance. We conclude, therefore, that his argument is without merit.

**E. McKinley's Sentence**

Following trial, a presentence report was prepared for McKinley setting forth the various transactions for which there was evidence that McKinley was involved, either by directly selling the cocaine or crack himself, or by having it sold from his house by his codefendants. Those amounts totaled 87.4 grams of crack. In addition, the PSR noted a March 1993 incident in which $75,695 was seized in Pennsylvania from a hidden compartment in a car linked to McKinley. And the PSR stated, somewhat conclusorily, that "information supplied by informants and information from other investigations" resulted in an estimate that the conspirators "distributed over 150 kilograms of cocaine in the Youngstown area, from 1989 to 1993." The PSR then set forth a base offense level of 34 pursuant to U.S.S.G. §§ 2D1.1, 1B1.3, based on an estimate that "[t]he total quantity of

drugs possessed and distributed during the course of this conspiracy is 173.8 grams of cocaine base and 25.2 grams of cocaine, which is equivalent to a marijuana weight of 3481.04 kilograms." Four levels were added because "[a]ccording to investigative information provided by the Government, the defendant's role is viewed as that of a leader, considering his degree of participation"; no specific factual underpinnings for this conclusion were provided.

The defendant filed objections to the quantity of drugs and the four-point enhancement for a leadership role. The district court ordered the parties to submit proposed findings of fact and conclusions of law on sentencing issues; the defendant, however, failed to do so.

Following the sentencing hearing, the district court issued detailed findings and conclusions. First, it concluded, that 173.8 grams of cocaine base was attributable to McKinley based on his own actions or the actions of his coconspirators. McKinley was further responsible for 7 ounces and 6 kilograms of cocaine listed in transactional ledgers found in his house, as well as 3.5 kilograms of cocaine represented by the currency seized in Pennsylvania, based on a price of $22,000 per kilogram. The court next held McKinley responsible for 10.6 grams of cocaine sold on August 24, 1993, as well as for 64.7 grams of lidocaine that McKinley sold under the belief that it was cocaine. The court concluded its amount computations with the following: "McKinley distributed his cocaine with the knowledge and understanding that it would be converted into crack cocaine before being distributed to the consumer."

The court then addressed the role-in-the-offense enhancement:

> The Court further finds that McKinley was a supplier of cocaine to others, including, but not limited to, the coconspirators in this indictment. The Court find [sic] that William A. McKinley was a leader or organizer of a criminal activity that involved five or more participants and was otherwise extensive as set forth in § 3B1.1(a) of the United States Sentencing Guidelines. Specifically, McKinley was a leader and organizer of a group which included Andre Rodriguez, Curtis Shep-

herd, Richard Edwards, Tariton Callier, Darnell Walker, Aaron Rogers, and others.

The resulting total offense level was 38, with a recommended sentencing range of 235 to 293 months. The court issued a judgment sentencing McKinley to 260 months' imprisonment.

### 1.

On appeal, McKinley argues that the district court erroneously attributed to him amounts of cocaine that were not reasonably foreseeable to him, and with which he was not involved. He contends that he was not a member of this conspiracy, because he was not a member of the Ready Rock Boys.

 The government bears a " 'burden of proving by a preponderance of the evidence the amount of drugs for which a defendant is accountable.' " *United States v. Charles*, 138 F.3d 257, 267 (6th Cir.1998) (citation omitted). A coconspirator is responsible, for sentencing purposes, for the amount of drugs that the government proves by a preponderance were the result of " 'reasonably foreseeable acts and omissions of others in furtherance of the' conspiracy." *United States v. Gaitan–Acevedo*, 148 F.3d 577, 593 (6th Cir.1998) (quoting U.S.S.G. § 1B1.3(a)(1)(B)). We review for clear error the district court's finding as to the quantity of drugs attributed to a defendant. *See Charles*, 138 F.3d at 267. As a general rule, a court's determination is not clearly erroneous if it is "supported by competent evidence in the record." *Id.* (citations and internal quotation marks omitted).

 McKinley has presented absolutely no basis for reversal on this point. His argument regarding his membership in the Ready Rock Boys is one that we have already discussed and rejected as being factually spurious, as well as legally inconsequential. He offers no other coherent, factually supported argument. For example, he contends that the members of the conspiracy kept their "buys" secret from one another, but he points to no evidence in the record supporting the assertion. Because we view the district court's findings as reasonable, well-articulated, and supported by citations

to evidence in the record, we conclude that McKinley's challenge fails.

### 2.

McKinley next argues that the district court erred in finding him responsible for any amount of cocaine base, or crack, as opposed to cocaine. He bases this argument on the alleged failure of the government expert to "positively identify the existence" of either baking soda or sodium bicarbonate, as required by the guidelines' definition of crack, in the samples provided by law enforcement officers. Therefore, he concludes, the cocaine under consideration was not crack. *See generally United States v. Valenzuela,* 150 F.3d 664, 667 (7th Cir.1998). The government disagrees with McKinley's characterization of the evidence, and points to testimony of the expert that supports the determination that the substance in question was crack.

█ The government also points out that McKinley did not raise this argument in the district court. It is well-established that sentencing arguments not raised in the district court are forfeited and, as a general rule, not considered by this court on appeal:

> Since the adoption of the sentencing guidelines, the sentencing of a criminal defendant has become a relatively complex procedure involving the consideration of a number of factors. In practice, however, the guidelines give the defendant an advance look at the sentence likely to be imposed and the factors justifying the sentence. Defendant then has an opportunity before sentencing to file objections and to be heard at sentencing on any issues that impact upon the sentence.
>
> If the system is to work and if appellate review is to be meaningful, it is absolutely essential that a defendant raise all objections to the sentence before the sentencing judge in the first instance. For this reason, the law has developed that a failure to object results in a waiver.

*United States v. Cullens,* 67 F.3d 123, 124 (6th Cir.1995).

We decline to address this argument because McKinley failed to alert the sentencing court that he had any concerns on this score. The question whether the substance in question met the criteria set forth in the guidelines for crack is a fact-intensive one. If the existence of any dispute on the subject had been called to the lower court's attention, it could have been definitively resolved through the presentation of evidence at the sentencing hearing. McKinley did not do so, though, and it is too late to do so now.

### 3.

█ McKinley's final sentencing challenge is that the district court clearly erred in finding that McKinley was an organizer, leader, manager, or supervisor of the conspiracy, and therefore increasing his offense level by two, pursuant to U.S.S.G. § 3B1.1(c). " 'A district court's determination regarding a defendant's role in the offense is reversible only if clearly erroneous.' " *United States v. Washington,* 127 F.3d 510, 515 (6th Cir.1997) (citation omitted), *cert. denied,* — U.S. —, 118 S.Ct. 2348, 141 L.Ed.2d 2718 (1998).

█ The government points to various items of evidence that it contends support the district court's determination. Our careful review of the evidence, however, makes clear that the government has greatly exaggerated the state of the record, as well as the significance of the testimony it cites. Further, the government implicitly exaggerates the extent of the case-law support for its position. None of the four cases it has relied on give it any aid; either the cases are inapposite, addressing the sentencing court's findings regarding the number of people involved in the conspiracy, *Elder,* 90 F.3d at 1110; *United States v. Ghazaleh,* 58 F.3d 240 (6th Cir.1995), or they involve leadership activity by defendants that is far in excess of what even the government believes the evidence showed here, *see United States v. Schultz,,* 14 F.3d 1093 (6th Cir.1994); *United States v. Perkins,* 994 F.2d 1184 (6th Cir. 1993).

Our own perusal of the record reveals nothing that suggests McKinley was a leader. Not a single witness, at trial or at sentencing, discussed any organizational role for McKinley, either administratively (by setting up deals or keeping track of people's salaries, as it were), or by actually directing the action. No one mentioned ever hearing McKinley

directing anyone to do anything. The inference we draw from reading the testimony is that McKinley answered to Edwards, and we find nothing to suggest that anyone answered to McKinley. In our view, the government has produced far below what it needs in order to sustain this enhancement, and we conclude that the district court's finding was clearly erroneous.

### F. Walker's Sentence

#### 1. Finality of Prior Convictions

Walker received a statutorily mandated sentence of life imprisonment, based on the district court's conclusion that he had committed an offense involving more than 50 grams of cocaine base at a time when he had two prior final felony drug-offense convictions. "[T]he Anti–Drug Abuse Act of 1986[, 100 Stat. 3207, 21 U.S.C. § 841 et seq.,] and subsequent legislation established a regime of extremely high penalties for the possession and distribution of so-called 'crack' cocaine." *United States v. Armstrong*, 517 U.S. 456, 478, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (Stevens, J., dissenting). "ADAA § 1002 created a new drug penalty classification for large-scale offenses involving certain narcotics, such as ... trafficking in more than one kilogram of heroin. For first-time offenders in these high-volume narcotics crimes, Congress authorized sentences of 10 years to life imprisonment." *Gozlon–Peretz v. United States*, 498 U.S. 395, 401, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991). And, 21 U.S.C. § 841 mandates a term of life in prison without parole for a defendant convicted of committing a violation of 21 U.S.C. § 841(a) involving more than 50 grams of crack cocaine after two prior felony convictions for drug offenses have become final.

Section 841(a) makes it unlawful "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). Section 846 criminalizes a conspiracy "to commit any offense defined in this subchapter[,] ... subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 21 U.S.C. § 846. Walker was convicted of engaging in a conspiracy under 21 U.S.C. § 846, the object of which was the commission of a violation of section 841(a)(1), thus making him subject to the penalty provisions of 21 U.S.C. § 841(b).

Walker contends that he should not have received a life sentence, arguing that he had only one final prior felony conviction at the time he committed the first overt act in the conspiracy, because at the time, he had not been sentenced on one of his two felony drug convictions; collaterally, he contends, the cocaine in that first sale should not be included in the amount personally attributable to him, meaning that he is responsible for less than the 50–gram threshold specified in the statute. He also argues, alternatively, that it is inappropriate to aggregate the separate overt acts in the conspiracy to reach a 50–gram total; he should only be subject to a life sentence if a single transaction was for more than 50 grams. These disputes raise issues of statutory interpretation, and we therefore conduct *de novo* review. *United States v. Brown*, 151 F.3d 476, 482 (6th Cir. 1998).

Central to an understanding of Walker's challenges is an understanding of the following chronology of his convictions for other felonies and his sales of controlled substances at issue in this case:

| Date | Event |
|---|---|
| 6/22/92 | Walker pleads guilty to aggravated trafficking in drugs and possession of criminal tools (case number 91 CR 621), a state felony |
| 1/3/93 | Walker pleads guilty to drug abuse (case number 92 CR 793), a state felony |
| 3/24/93 | Walker receives a suspended sentence and two years of probation on the aggravated-trafficking charge 26 |
| 4/9/93 | Walker sells **5.5 grams** of crack cocaine |
| 4/21/93 | Walker receives a suspended sentence and two years of probation on the drug-abuse charge |
| 4/30/93 | Walker sells **5.8 grams** of crack cocaine |
| 8/11/93 | Walker sells **22.8 grams** of crack cocaine |
| 9/1/93 | Walker sells **19.7 grams** of crack cocaine |

**a.**

We first consider whether Walker's April 9, 1993, sale is properly treated as having

been made after "two ... prior convictions for a felony drug offense have become final," 21 U.S.C. § 841(b)(1)(A)(iii), since at the time Walker had pleaded guilty to both prior drug offenses but had been sentenced only on one.

 "[T]he meaning of the phrase 'have become final' in 21 U.S.C. § 841(b)(1)(B) [i]s a question of federal law rather than state law." *United States v. Cisneros,* 112 F.3d 1272, 1280 (5th Cir.1997). The statute itself contains no definition of the term "final," *see United States v. Howard,* 115 F.3d 1151, 1158 (4th Cir.1997), and we therefore turn to the relevant case law. We find it well-settled that a prior conviction is "final" within the meaning of section 841(b) when the time for taking a direct appeal from the judgment of conviction has expired. *See id.; United States v. Brazel,* 102 F.3d 1120, 1163 (11th Cir.), *cert. denied,* — U.S. —, —, 118 S.Ct. 78, 79, 139 L.Ed.2d 37 (1997), *and cert. denied,* — U.S. —, 118 S.Ct. 720, 139 L.Ed.2d 659 (1998); *cf. United States v. Hughes,* 924 F.2d 1354, 1359 (6th Cir.1991).

In accordance with Ohio Rule of Appellate Procedure 4(A), a criminal defendant must file a direct appeal within thirty days after sentence is imposed. *See* OHIO REV.CODE ANN.APP. R. 4(A). Walker did not file an appeal from this second conviction, and accordingly, the conviction became final on May 21, 1993, well after two of the four sales he was held accountable for, amounting to 11.3 grams of the total 53.8 grams of cocaine base directly attributable to him during this conspiracy.

Therefore, Walker's second "prior" conviction was not a "final" conviction at the time of this conspiracy, and on April 9, 1993, the date he committed the first overt act of the conspiracy.

 Having resolved that much, we must now consider the legal effect of this conclusion. Walker has urged that any cocaine sold prior to the time both convictions became final should not be included in the calculation of the total amount sold, and that therefore, he was not responsible for selling 50 grams, and the statutory sentence has not been triggered. There is no question that this reasoning has a certain appeal, as a plausible means to avoid what is a Draconian

sentence. But to follow this route would be to ignore the logic of a conspiracy charge. While it is true that the conspiracy came into existence before the second conviction was final, it is also indisputably true that Walker continued to be involved in the conspiracy *after* both prior convictions were final. Thus, "he 'committed' the crime of conspiracy throughout the duration of the conspiracy." *Lovell,* 16 F.3d at 497. And therefore, it must be said that Walker committed the crime of conspiracy after he had two final felony drug-offense convictions.

Walker's argument would require that we give unwarranted legal significance to the date of each overt act. But Walker was not charged with four discrete violations of the drug laws, one for each sale. He was charged with a single, ongoing conspiracy. He committed the conspiracy every day over the life of the agreement, and the timing of each separate overt act is not controlling. We conclude, therefore, that Walker committed a violation of 21 U.S.C. § 846 at a time that he had two prior final convictions. We also conclude that the violation involved more than 50 grams of cocaine base. Therefore, the district court properly applied the statutory sentence mandated by 21 U.S.C. § 841(b)(1)(A).

**b.**

 What we have said above effectively answers Walker's contention that a conspiracy conviction involving multiple sales that together total more than 50 grams does not constitute "*a* violation" within the meaning of the statute. We disagree because, as we have said, a conspiracy is a single violation of the drug laws, and the fact that this particular conspiracy was characterized by separate transactions is a fact of no legal significance. We note, too, that Walker's reliance on our decision in *United States v. Winston,* 37 F.3d 235 (6th Cir.1994), is misplaced because of important factual distinctions.

In *Winston,* the defendant was convicted of conspiracy to possess cocaine base with intent to distribute, in·violation of 21 U.S.C. § 846, and of two counts of aiding and abetting the possession of cocaine base with intent to distribute, in the amount of 23.4

grams and 37 grams each. Winston was arrested when his codefendant sold 23.4 grams of crack cocaine to a confidential informant, and the codefendant informed authorities that he had gotten the crack from Winston. The police obtained a search warrant for Winston's house, where they found 37 grams more of crack.

Following his conviction, Winston was sentenced to a mandatory term of life imprisonment under 21 U.S.C. § 841(b)(1)(A). As an initial matter, this court held as follows:

> It is obvious from the statute's face— from its use of the phrase "a violation"— that this section refers to a single violation. Thus, where a defendant violates subsection (a) more than once, possessing less than 50 grams of cocaine base on each separate occasion, subsection (b) does not apply, for there is no single violation involving "50 grams or more" of cocaine base. This is true even if the sum total of the cocaine base involved all together, over the multiple violations, amounts to more than 50 grams.

*Id.* at 240.

The court then considered the precise charges against Winston, and noted that only the conspiracy charge was a charge involving 50 grams or more of crack—to be precise, 50.4 grams—as the other two substantive charges involved 23.4 and 37 grams. Thus, it concluded "only this first charge can trigger the imposition of a life sentence pursuant to this section." *Id.* at 241. But although the indictment had charged a conspiracy involving 50 grams, the government had not proved that such a conspiracy existed: "When sentencing ..., the lower court expressly found, by a preponderance of the evidence, that the conspiracy ... involved only the 23 grams of cocaine base" sold by Winston's codefendant to the CI. *Id.* Further,

> [t]here was no evidence linking the conspiracy to the 37 grams found at Winston's house. The government conceded at oral argument that there was no evidence that the defendants had sold drugs together before, and that there was "a problem" with the sufficiency of the evidence in support of the claim that the count one conspiracy involved more than 50 grams of cocaine. It follows that, despite the language in the indictment describing an

amount of cocaine base "in excess of 50 grams," the amount of drugs that the court determined to be involved in the conspiracy was insufficient to justify the imposition of an enhanced sentence....

*Id.*

We conclude that not only does *Winston* not aid Walker, it in fact compels a result unfavorable to him. The *Winston* court made clear that a conspiracy involving more than 50 grams would have been "a violation" within the meaning of section 841(b)(1); further, it did not suggest that there was any barrier to aggregating the separate overt acts of the conspiracy to reach a total of 50 grams. *See United States v. Pruitt*, 156 F.3d 638, 643 (6th Cir.1998). And unlike in *Winston*, there is no dispute here regarding the sufficiency of the evidence to show that the conspiracy involved a total of more than 50 grams. The *Winston* court held that the sole barrier to sentencing under section 841(b)(1) was that the particular conspiracy charged and proven involved less than 50 grams. Implicit in this reasoning is the counterfactual: if the conspiracy had involved 50 or more grams, the enhanced sentence would have been appropriate. In the course of his membership in this conspiracy, Walker was directly responsible for selling more than 50 grams, and the statutory life sentence was therefore necessarily imposed.

### 2. Validity of State–Court Guilty Plea

#### a.

As we have mentioned, Walker pleaded guilty in the Court of Common Pleas of Mahoning County, Ohio, on June 22, 1992, to the state-law offense of aggravated trafficking in drugs and possession of criminal tools. At the guilty-plea hearing, Walker was represented by attorney Michael Morley.

Walker now argues that this conviction was constitutionally defective, and therefore cannot be a predicate for the imposition of the statutory mandatory sentence. Specifically, he contends that his plea was neither knowing nor voluntary. In considering and ultimately rejecting Walker's challenge to the constitutionality of this conviction, the district court found as follows:

A Plea Form was submitted to Walker during the change of plea hearing which he completed and signed. The judge personally addressed Walker and explained the sentence he could receive for the entry of a guilty plea; inquired as to whether he was coerced; whether the elements of the offense were explained to him by counsel and that he was entitled to a confront [sic] witnesses against him during a trial by jury. Walker was asked by the judge whether he understood everything on the Plea Form to which he replied "Yes, Your Honor." [The trial judge] also inquired whether he had any questions, to which Walker replied, "No, Sir."

The district court further found that "[t]he plea hearing transcript reveals that the court inquired as to whether Walker read and understood the plea form before he signed it. Walker unequivocally stated . . . that Morley went over the plea form with him and that he understood the elements of the charge."

The court also found as follows:

On July 24, 1995, Michael Morley testified before this Court during an evidentiary sentencing hearing that he had counseled Walker concerning [his guilty plea]. Morley testified that he advised Walker that the State had a strong case against him and that he would try to have the charges reduced so they would be "probationable." Morley further testified that Walker is a bright young man, and that he fully understood his options before entering guilty pleas. Morley stated that he went over the agreement with Walker "line by line" until Walker understood the form completely.

The district court rejected as not credible Walker's testimony "that he did not wish to enter a guilty plea," that "he advised Morley that he wanted to go to trial," and that "Morley did not go over the Plea Form with him, but merely told him where to sign it." The court noted, however, that Walker and Morley did agree on one point: Walker "is a bright young man."

**b.**

■ Walker here criticizes the state court judge who took the guilty plea for failing to inquire into Walker's educational level or whether he was under the influence of drugs or alcohol. Further, Walker argues, his answers during the colloquy were simply, "Yes, your Honor," without further elaboration, and therefore, they provide an insufficient basis for concluding that his plea was knowing and voluntary. Finally, he complains that the state court did not establish a factual basis for the plea, and did not identify the elements of the offense.

Under 21 U.S.C. § 851(c), a defendant subject to enhanced sentencing on the basis of a prior conviction is permitted to challenge the constitutionality of that conviction:

(1) If the person denies any allegation of the information of prior conviction, or claims that any conviction alleged is invalid, he shall file a written response to the information. . . . The court shall hold a hearing to determine any issues raised by the response which would except the person from increased punishment. . . . The hearing shall be before the court without a jury and either party may introduce evidence. Except as otherwise provided in paragraph (2) of this subsection, the United States attorney shall have the burden of proof beyond a reasonable doubt on any issue of fact. At the request of either party, the court shall enter findings of fact and conclusions of law.

(2) A person claiming that a conviction alleged in the information was obtained in violation of the Constitution of the United States shall set forth his claim, and the factual basis therefor, with particularity in his response to the information. The person shall have the burden of proof by a preponderance of the evidence on any issue of fact raised by the response.

21 U.S.C. § 851(c).

■ It is well-established that "[o]nce the government establishes the fact of a prior conviction based upon a guilty plea, the defendant must prove the invalidity of the conviction by a preponderance of the evidence." *United States v. Barlow,* 17 F.3d 85, 89 (5th Cir.1994) (citing *Parke v. Raley,* 506 U.S. 20, 32–34, 113 S.Ct. 517, 525, 121 L.Ed.2d 391 (1992)); *see* 21 U.S.C. § 851(c)(2). Thus, the district court's conclusion that a plea is voluntary is to some degree a factual finding, subject to review for clear error. *See Bar-*

*low,* 17 F.3d at 89; *Dorrough v. United States,* 385 F.2d 887, 893 (5th Cir.1967); *see also United States v. Mims,* 928 F.2d 310, 311 (9th Cir.1991). Obviously, however, the ultimate question whether a plea was voluntary requires a legal conclusion, one "reached by applying legal rules to facts." *United States v. Wildes,* 910 F.2d 1484, 1486 (7th Cir.1990). Our review of this ultimate question is, therefore, *de novo. See United States v. Bushert,* 997 F.2d 1343,1352 (11th Cir.1993); *see also Sanchez v. United States,* 50 F.3d 1448, 1454 (9th Cir.1995).

■■■ There is no requirement that in order to rely on a defendant's answers in a guilty-plea colloquy to conclude that the defendant pleaded guilty knowingly and voluntarily, those answers must be lengthy and all-encompassing; a straightforward and simple "Yes, your Honor" is sufficient to bind a defendant to its consequences. *Cf. Blackledge v. Allison,* 431 U.S. 63, 73–74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977). The defendant simply has not presented sufficient evidence to prove by a preponderance that his plea was other than knowing and voluntarily; he cannot overcome his affirmations at the plea hearing that his counsel had informed him of the elements of the crime, and that he understood his rights. While it is true that the state court proceedings did not set forth a factual basis for the plea, that is not constitutionally required; further, the plea form that Walker affirmed he understood recited the elements. Walker has not presented anything to lead this court to believe that a factual basis was actually lacking; there is no reason to suspect, that is, that he was not pleading guilty for any reason other than that he actually was guilty.

We conclude, therefore, that there is nothing constitutionally infirm about the state-court conviction following his guilty plea to aggravated trafficking, and there was no constitutional bar to the district court's use of the conviction as a predicate under 21 U.S.C. § 841(b).

### III.

The defendants' convictions are **AFFIRMED**, as is Walker's sentence. McKinley's sentence is **VACATED** because the district court clearly erred in finding he was a leader of the conspiracy, and the matter is **REMANDED** for resentencing.