RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0004p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

────────────────

UNITED STATES OF AMERICA,

> *Plaintiff-Appellee,*

v.

TOMARCUS BASKERVILLE (24-5547); COURTLAND SPRINGFIELD (24-5574); THOMAS EARL SMITH (24-5598),

> *Defendants-Appellants.*

Nos. 24-5547/5574/5598

Appeal from the United States District Court for the Western District of Tennessee at Memphis.
No. 2:22-cr-20068—Sheryl H. Lipman, Chief District Judge.

Argued: October 23, 2025

Decided and Filed: January 8, 2026

Before: THAPAR, READLER, and HERMANDORFER, Circuit Judges.

────────────────

## COUNSEL

**ARGUED:** Jocelyn V. Henderson, Memphis, Tennessee, for Appellant Baskerville. John H. Parker II, LAW OFFICE OF JOHN H. PARKER II, Memphis, Tennessee, for Appellant Springfield. Benton C. Martin, OFFICE OF THE FEDERAL COMMUNITY DEFENDER, Detroit, Michigan, for Appellant Smith. John-Alex Romano, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Jocelyn V. Henderson, Memphis, Tennessee, for Appellant Baskerville. John H. Parker II, LAW OFFICE OF JOHN H. PARKER II, Memphis, Tennessee, for Appellant Springfield. Benton C. Martin, OFFICE OF THE FEDERAL COMMUNITY DEFENDER, Detroit, Michigan, for Appellant Smith. John-Alex Romano, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., William C. Bateman III, Neal Oldham, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.

———————————

**OPINION**

———————————

HERMANDORFER, Circuit Judge.  This appeal stems from a gang war that unleashed mayhem and murder in the Memphis suburbs.  For years, a group known as the Junk Yard Dogs—itself an offshoot of a gang called the Almighty Vice Lord Nation—sought to preserve its reputation and power by warring with rival gangs.  Junk Yard Dogs members filled defined ranks, paid dues, and executed top-down orders to target rival gang members with violence.  Their rivals would respond in kind, and the cycle would repeat.  Those back-and-forth tensions boiled over in the summer of 2020.  Over three months, the Junk Yard Dogs alone carried out five separate shootings that injured eleven victims and caused one death.

In 2023, federal prosecutors obtained a grand-jury indictment against 15 of the Junk Yard Dogs.  All but one were convicted of crimes ranging from racketeering conspiracy to murder and attempted murder in aid of racketeering to firearm offenses—most by guilty plea.  These appeals feature three Junk Yard Dogs members who instead went to trial: Tomarcus Baskerville, Thomas Smith, and Courtland Springfield.  After lengthy proceedings, a jury convicted each of various racketeering, murder, and firearms crimes.  Their appeals now raise six issues involving sufficiency-of-the-evidence challenges and alleged constitutional and sentencing errors.

We affirm all of the defendants' convictions.  But consistent with the Government's confession of sentencing error, we vacate Smith's sentence and remand for resentencing.

I

*The Junk Yard Dogs.*  In 1958, teenagers in Chicago founded the Almighty Vice Lord Nation.  David Dawley, *A Nation of Lords: The Autobiography of the Vice Lords* 10 (2d ed. 1992).  From the start, the name of the Vice Lords' game was gang warfare.  *Id.* at 10-23.  From Chicago's West Side, the Vice Lords launched hostile takeovers of other "clubs" in the neighborhood.  *Id.*

As the years passed, new branches grew from the Almighty Vice Lord Nation's roots. One of those subsets—the Traveling Vice Lords—spread southward and sprung offshoots of its own. In West Tennessee, a clique called the Junk Yard Dogs dominated. The Junk Yard Dogs' primary chapter—or "deck"—operated in Fayette County, its members spread out among the Memphis suburbs. Trial Tr., R.1004, PageID 4850.

Trial evidence showed that these new offshoots adhered to a strict hierarchy. "Five Star Universal Elite[s]" sat atop the Junk Yard Dogs. Trial Tr., R.1007, PageID 5675. Among those Universal Elites, the "chief of the streets" was the first among equals, directing gang activity and declaring war. Trial Tr., R.1004, PageID 4853, 4873, 5011. At the time our story starts, defendant-appellant Tomarcus Baskerville filled this role. Starting in 2013, he operated as the Chief of the Streets for the entire state of Tennessee. And the gang's headquarters, District 15, was located at Baskerville's home in Somerville, Tennessee.

Second-tier leaders had titles of their own. Defendant-appellant Thomas Smith held the rank of "Five Star Branch Elite," as did Martivus Baskerville ("Martivus" from here on, to avoid confusion). Trial Tr., R.1005, PageID 5171. Martivus further served as "deck holder"— functionally, Baskerville's right-hand man. Trial Tr., R.1004, PageID 4853. In that role, he supervised the 30-odd Junk Yard Dogs in Memphis and executed Baskerville's orders. Smith served as second in command to Martivus. Finally, the gang's foot soldiers, called "representers," filled out the rest of the ranks. *Id.* at PageID 4853, 4855. The remaining defendant-appellant, Courtland Springfield, served in the "representer" role.

The Junk Yard Dogs used this hierarchy to reinforce the gang's rules and code of conduct. They received rank promotions when they "put[] in work on the streets" by "demonstrat[ing] and tak[ing] care of the business," which meant "somebody getting shot or killed." *Id.* at PageID 4875-76, 4986-87. And they were demoted and punished when gang leadership determined that a member violated gang rules or failed to follow the chain of command.

*The Gang War.*  Like their Vice Lords forefathers in the 1950s and 60s, the Junk Yard Dogs of the 2010s feuded with other gangs.  Their nemeses included the Gangster Disciples, a rival gang, and the Four Corner Hustlers, a distant cousin in the Vice Lords family tree.

From the start of his tenure as Chief of the Streets, Baskerville guarded the gang's reputation by flexing his power to order killings.  In 2015, for example, he ordered several Junk Yard Dogs to pick up Guy Williamson.  The reason?  Baskerville believed Williamson had been impersonating "the chief" of the Traveling Vice Lords in "the southern region."  *Id.* at PageID 4931.  After the gang brought Williamson back to District 15, Baskerville ordered several gang members to take care of the problem.  Those gang members piled in the car *with* Williamson.  An hour later, the same group pulled back up *without* Williamson.  Williamson was found dead in a field, shot through the head, later that day.

Fast forward to fall 2019.  A member of the Junk Yard Dogs killed the local leader of the Gangster Disciples during a family dispute.  Even though the Junk Yard Dogs didn't order the hit, the Gangster Disciples blamed them for the death and carried the grudge into 2020.  Tensions between the two gangs, which had simmered for months, reached a boiling point that summer.

The violence began on June 16, 2020, at an outdoor graduation party attended by many Junk Yard Dogs.  Midway through the event, a group of Gangster Disciples rivals cut through the crowd, guns in hand.  One of the Junk Yard Dogs, incensed by the intrusion, "snatched a gun out of [his] homeboy['s] . . . hand and started shooting."  Trial Tr., R.1012, PageID 6387.  The Gangster Disciples returned fire, hitting Montaveen Taylor, a Junk Yard Dog representer, in the leg.

Later that night, the Junk Yard Dogs declared war on their rival gangs during an emergency meeting held at District 15.  While Baskerville met with Martivus inside, the gang members traded news about who shot Taylor.  Most believed that Stefon McNeal, an alleged member of the Gangster Disciples, and Willie Perry, an alleged member of the Four Corner Hustlers, were responsible.  Meanwhile, inside the house, Baskerville told Martivus the Junk Yard Dogs were "[g]oing to war" and gave instructions "to shoot."  Trial Tr., R.1004, PageID

4873, 5006.  The two men then walked out of the house, and Martivus, with Baskerville at his side, relayed the orders to the group.

Although Baskerville gave the order "to shoot," Martivus, as deck holder, decided "who" would go do the "shoot[ing]."  *Id.* at PageID 5006.  He sent one group to "carry out" a "[d]emonstration on" Stefon McNeal and another group to "shoot or kill" Willie Perry.  Trial Tr., R.1008, PageID 5707; Trial Tr., R.1004, PageID 4878.

Martivus led the group out for revenge on Willie Perry.  Smith drove, dropping Martivus and three other gang members off at Perry's home.  Despite the presence of several bystanders—including children—in the front yard, the Junk Yard Dogs opened fire.  Two people were injured.  After the shooting stopped, the gang members fled to the end of the street, where Smith picked them up and sped off.  At the same time, another group of Junk Yard Dogs approached the home of Stefon McNeal and started shooting.  Four bullets struck McNeal.

The Gangster Disciples retaliated.  Later that summer, a group of them shot up District 15—Baskerville's home turned Junk Yard Dogs headquarters.  In the process, the triggermen hit and wounded Baskerville's mother.  The Gangster Disciples struck again in early August.  This time, they opened fire at party hosted by Baskerville at a local community center.

Baskerville, in response, ordered Martivus to carry on with the war, commanding "kill or be killed."  Trial Tr., R.1004, PageID 4887-88.  In line with Baskerville's order, Martivus carried out two more hits.  The first took place on August 9, 2020.  Martivus and two other Junk Yard Dogs drove to the home of Marius Williams—a Gangster Disciple rumored to have played a role in the shooting at the community center.  Upon arrival, the gang members aimed at the window where Williams slept and opened fire.  They hit Williams's wife in the foot but missed Williams.  The second took place on August 10, 2020.  Four Junk Yard Dogs shot up the home of another alleged Gangster Disciple, Mardreques Payton.  This time, no one was injured.

The violence culminated on August 23, 2020, at a nightclub called the "Dead End."  Baskerville made club attendance mandatory that night; Smith and many other Junk Yard Dogs showed up.  Trouble began when Teiona Lewis, Martivus's ex-girlfriend, arrived and began to

argue with Martivus.  The Gangster Disciples weren't far behind her.  Around ten arrived at the club wearing their gang colors, glaring at the Junk Yard Dogs, and brandishing their guns.

Upon the Gangster Disciples' arrival, Baskerville ordered the Junk Yard Dogs out of the club.  As they left the building, Baskerville threatened that he wanted to "air it out and demonstrate."  Trial Tr., R.1007, PageID 5614.  Teiona followed them out, yelling she wanted their "best fighter."  Trial Tr., R.1050, PageID 8343.  Baskerville and Martivus responded:  "We not gonna fight, we gonna shoot."  *Id.*  Not long after, Smith, Baskerville, and Martivus gathered around an open car trunk, where they "pass[ed] something to each other" with a "cover . . . over it" and put it "in the backseat of the car."  Trial Tr., R.1007, PageID 5567.

The Junk Yard Dogs then drove away and regrouped at a gas station, where plans for yet another hit on the Gangster Disciples were hatched.  On the ride over, Baskerville told Martivus, "[W]e can't constantly let them play with us like that."  Trial Tr., R.1004, PageID 4912.  "They shot Mama," he continued, adding, "they ain't going to get away with it."  *Id.*  Instead, the Junk Yard Dogs needed to return and "demonstrate on them."  *Id.*

Once at the gas station, Baskerville spoke with Smith and Martivus inside.  When the three men exited, they circled up with the rest of the Junk Yard Dogs to communicate next steps.  Springfield filled the group in on the Gangster Disciples' location back at the Dead End; Martivus asked people to "demonstrat[e]" with him; and, at some point, Baskerville told the group "to take care of it."  *Id.* at PageID 4914-15; Trial Tr., R.1008, PageID 5715.  Several carloads moved out from there.  Two cars filled with armed Junk Yard Dogs headed back to the Dead End.  In keeping with Junk Yard Dogs' protocol, which always required securing Baskerville, Smith split off from the group to help escort Baskerville home.

Meanwhile, two carloads of Junk Yard Dogs arrived back at the Dead End club.  At that point, Martivus, Montaveen Taylor, and Springfield "jumped out of the car[s]" and started shooting the people standing outside.  Trial Tr., R.1050, PageID 8348.  Bullets struck one victim in the arms and lungs, killing him.  The second victim, the Dead End's owner, was struck in the face.  The third victim was shot in both legs.  The fourth victim was shot twice in the left leg.  And a fifth victim was shot in the back.

*The Prosecution and Trial Proceedings.*   This gang war attracted the attention of federal prosecutors.   And two years later, the Government obtained a grand-jury indictment against many Junk Yark Dogs.   Eventually, a superseding indictment charged 15 gang members with various racketeering and firearms crimes related to the murders and attempted murders.   Eleven of the defendants pled guilty, and at least six ended up cooperating with the Government.   But Smith, Baskerville, Springfield, and another Junk Yard Dog named Michael Hobson proceeded to trial.

The ensuing trial lasted four weeks.   At it, the Government presented testimony from 58 witnesses as well as physical evidence ranging from bullet casings to crime-scene weapons to DNA samples.   A host of cooperating codefendants provided in-depth descriptions of the Junk Yard Dogs' structure and rules, the gang war in 2020, and the shooting of Guy Williamson in 2015.   The Government also introduced thousands of pages of texts and calls extracted from the phones of Junk Yard Dogs members.   In addition to the underlying data, the Government presented six charts that summarized the phone communications between gang members during the various shootings.

*Jury Deliberations, Verdict, and Sentencing.*   After both sides' presentations closed, the jury deliberated for three days before it reached an impasse.   By way of note, it informed the district court that there was "a situation . . . causing a deadlock":  one of the jurors "refuse[d] to . . . participate in the deliberations process."   Trial Tr., R.1017, PageID 7340, 7360.   The district court provided a standard charge that reminded the jury of its oath, raised the risk of contempt for violating the oath, and instructed the jurors to keep deliberating.

The next morning, the jury sent a note that alerted the district court to an "extremely sensitive situation."   Trial Tr., R.1055, PageID 8938.   "Two or more jurors," the note explained, "have experienced multiple situations outside of the courthouse that they strongly believe to be attempts of jury intimidation."   *Id.* at PageID 8938-39.   The district court considered how to respond.  It first conferred with a senior judge.  It then gathered counsel for the parties to discuss. *Id.* at PageID 8938-40.

After reading the note, the district court proposed an initial response.  The district court suggested that it speak with the foreperson off the record "to get information as to whether . . . there could be jury intimidation going on" and, if so, whether "it is interfering with their ability to deliberate." *Id.* at PageID 8939.  It suggested speaking privately with the foreperson to "make this person more comfortable." *Id.* at PageID 8940.  But it clarified that it "won't" take that step "unless I have all of your consent." *Id.*

Counsel then weighed in.  The Government's attorney sought to clarify whether the district court intended to speak with the foreperson or the "persons who have concerns." *Id.* at PageID 8940.  The district court confirmed its intent to speak only with the foreperson "[t]o start," and said it "wouldn't go beyond that until we confer." *Id.*  The Government's lawyer had no "objection" to that plan. *Id.*  Baskerville's attorney agreed "it would be best" for the meeting to occur "ex parte" with only the district court and its clerk, but requested that it be conducted "on the record." *Id.* at PageID 8940-41.  Smith's counsel expressed that she was "quite comfortable with not being there" for the foreperson meeting. *Id.* at PageID 8942.  Springfield's attorneys agreed that the district court should meet with the foreperson in "the least intimidating atmosphere possible" and otherwise endorsed the suggestions of Baskerville's attorneys. *Id.* at PageID 8942-43.

The district court proceeded to its conversation with the foreperson.  That discussion revealed that two jurors had raised what they thought might be attempted intimidation.  One juror spotted the same vehicle—a silver Chevy Tahoe—twice during the first two days of jury deliberations but paid the SUV little mind.  The next day, the silver Tahoe blocked the juror's path as the juror attempted to leave a school parking lot.  A man jumped out of the Tahoe and snapped photos of the juror's car.  Later that night, the second juror was driving home when a black vehicle started tailgating and then attempted to run the juror's car off the road.

These incidents had come to light in two stages.  The juror reporting the silver Tahoe described the incident to the whole jury late in the third day following the district court's charge.  The next morning, the jury discussed the situation as a group when it reconvened.  The juror involved in the incident felt comfortable with "just going ahead and going through deliberations." *Id.* at PageID 8953.  The foreperson then asked the other jurors whether they

could "still . . . render a vote," and "everybody said yes." *Id.* at PageID 8954. At that point, the second juror came forward and described the tailgating incident with the black vehicle. After the jury "took a beat," the foreperson asked the jurors whether they felt ready to "take a vote and talk." *Id.* at PageID 8955-56. Once again, every juror responded, "Yeah, let's." *Id.* at PageID 8956.

After hearing the whole story, the district court questioned the foreperson about the jury's ability to render an impartial verdict. The foreperson confirmed that, after the jury learned about the silver-Tahoe incident, it decided to "take" the incident "out of the equation" and "continue to deliberate and reach a fair and impartial verdict." *Id.* at PageID 8953-55. The district court then asked whether the jurors also believed that they could "continue to deliberate and render a fair and impartial verdict" after they learned about the tailgating incident. *Id.* at PageID 8955. And the foreperson affirmed that the jurors' response was the "same." *Id.* The district court instructed the foreperson that the jury should keep deliberating while it discussed the situation with the parties' counsel.

The district court reported its conversation to the parties' counsel and recommended a course of action. It proposed that it should speak to each juror individually and provide the jurors with security at their homes. The foreperson, in the district court's view, was "doing a great job of assessing the jury." *Id.* at PageID 8967. But still, the district court believed it had an "obligation to just touch base with each of the jurors individually and make sure each one is comfortable moving forward." *Id.*

The defendants' counsel pushed back strongly against the district court's proposal, opting to move for a mistrial instead. Baskerville's attorneys, for their part, asked for a mistrial and cautioned that the district court's proposal to question every juror gave them pause. "[I]f we get into asking more personal questions," one of his attorneys explained, "then we're going further into the taint" on the jury. *Id.* at PageID 8971. Another echoed that concern when it came to providing the jury with additional security. In her view, if the jury was told "we're going to send security home with you," it would communicate that "there [was], in fact, a threat here, where we don't know." *Id.* Towards the end of the conference, one of Baskerville's attorneys

reiterated that if the district court moved ahead with the trial, there was no "need to do individual conferences right now because that just pushed [the taint] further." *Id.* at PageID 8978.

Smith's counsel told the district court that Baskerville's attorneys "made very valid points." *Id.* at PageID 8972. On the topic of extra security specifically, she emphasized that the "security" could "throw[] up a huge red flag." *Id.* at PageID 8973. She urged against any course that risked further "taint[ing]" the jury when they didn't "know whether" the threats came from the Junk Yard Dogs. *Id.* at PageID 8972-73.

Finally, Springfield's and Hobson's respective attorneys explicitly encouraged the district court to let the jury keep deliberating without further intervention. As for Springfield, one of his attorneys agreed a mistrial was warranted. But his other attorney opined, "I think we've done enough," before declaring: "Let [the jury] deliberate. Quit interfering with them. . . . [I]f you're going through hell, keep on going." *Id.* at PageID 8975. Hobson's counsel agreed with that position, stating the problem would "[t]ake care of itself." *Id.* Springfield's attorney then summed up their shared sentiments: "Leave them alone. . . . They will let us know if there's . . . a further problem or other issues." *Id.*

The defendants' joint position "persuaded" the district court "not [to] bring[] the individual jurors in now." *Id.* at PageID 8979. It also denied the defendants' motions for mistrial, explaining that it did not "believe the jury ha[d] been improperly tainted." *Id.* at PageID 8978-80. The court emphasized that the foreperson had explained that the jurors, as a group, decided that they could "move forward and deliberate, based on the evidence and the law in this case." *Id.* And "based on [its] conversation with" the foreperson, the district court believed that the foreperson would come forward "if he felt like" the suspected intimidation "was getting in the middle of their deliberations." *Id.* at PageID 8979.

For good measure, the district court then called the foreperson in for one last meeting. Once more, it asked the foreperson to confirm whether the jury could "put these situations aside" and "consider the evidence . . . and work toward a verdict" that was "fair and impartial." *Id.* at PageID 8982. The foreperson answered, "Yes." *Id.* The district court next asked the foreperson to remind the rest of the jurors that they should make "no assumption about" the origin of the

incidents.  *Id.* at PageID 8984-85.  The foreperson assured the court that the jurors had discussed that fact, and together, they had concluded that the incidents "could literally be a[n] anything burger."  *Id.*

Later that day, the jury returned a split verdict.  It convicted Baskerville, Smith, and Springfield of racketeering conspiracy.  It found Baskerville guilty of two counts of murder, eight counts of attempted murder, and ten counts of firearm offenses related to those crimes.  It found Springfield guilty of five counts of attempted murder and five counts of firearm offenses tied to the shooting on August 23, 2020, but it acquitted him of similar charges for the shootings on August 9 and 10, 2020.  And it found Smith guilty of attempted murder and a firearm offense related to the attempted murder of Willie Perry on June 17, 2020.  For the firearm conviction, the jury found only that Smith used or carried the firearm; it did not find that he brandished or discharged it.  As for Hobson, he'd been charged only in connection with the 2015 murder of Williamson.  The jury acquitted him on all counts.

The district court polled the jury afterward.  It specifically asked each juror whether he or she voted "based on the facts, evidence, and law . . . and nothing else."  Trial Tr., R.1056, PageID 9010-14.  Each juror confirmed that he or she had.

At that point, the Government raised the suspected intimidation a final time.  It flagged that a full "hearing may be necessary."  *Id.* at PageID 9014.  The district court disagreed.  It explained that its questioning of the foreperson provided "enough information to determine that there was not undue influence on the jury."  *Id.* at PageID 9015.  The district court also highlighted that its post-verdict "question[s]" attempted to "clarify whether there was anything else influencing [the jurors]."  *Id.*  The unanimous answer of "no," *id.* at PageID 9010-14, the district court concluded, confirmed that the suspected intimidation did not affect the jury's verdict, *id.* at PageID 9015.

None of the defendants echoed the Government's comments about a hearing.  Instead, Baskerville's counsel renewed her mistrial motion, which the district court denied.  In its view, the jury wasn't "unduly impacted," and the split verdict indicated that the jury gave "very careful consideration of the evidence."  *Id.* at PageID 9016-17.

Months later, the district court sentenced the defendants. As relevant here, the district court sentenced Smith to 255 months' imprisonment. For two of the counts—attempted murder and racketeering conspiracy—the district court sentenced Smith to 135 months' imprisonment. For the firearm charge, the district court imposed a consecutive 10-year mandatory minimum sentence for discharging the firearm. *See* 18 U.S.C. § 924(c)(1)(A)(iii).

Baskerville, Smith, and Springfield timely appealed. *See* Fed. R. App. P. 4(b)(1). We have jurisdiction. *See* 18 U.S.C. § 3742(a); 28 U.S.C. § 1291.

II

Baskerville and Smith both bring sufficiency-of-the-evidence challenges to their convictions. These challenges face "uphill battle[s]." *United States v. Wagner*, 382 F.3d 598, 610 (6th Cir. 2004). Although we review sufficiency-of-the-evidence challenges de novo, *United States v. Gardner*, 32 F.4th 504, 522 (6th Cir. 2022), that de novo review is "highly deferential" to the jury's verdict, *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007). We ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We view the "evidence in the light most favorable to the prosecution." *Id.* And we resolve "all issues of credibility in favor of the jury's verdict." *United States v. Brown*, 888 F.3d 829, 833 (6th Cir. 2018) (citation and internal quotation marks omitted).

We address Baskerville's challenge and then Smith's. Neither succeeds.

A

Baskerville argues that the evidence at trial was insufficient to sustain his convictions for violent crimes in aid of racketeering. At trial, the jury convicted him of eight counts of attempted murder in aid of racketeering. Those counts tracked with the attempted murders of Stefon McNeal and Willie Perry on June 17, 2020, of Marius Williams on August 9, 2020, of Mardreques Payton on August 10, 2020, and of the four injured victims who survived the shooting on August 23, 2020. The jury also convicted Baskerville of two counts of murder in aid

of racketeering: one for the murder of Guy Williamson in 2015, and one for the victim of the Dead End club shooting who died on August 23, 2020.

To convict Baskerville of a violent crime in aid of racketeering, the Government needed to prove five elements. *See United States v. Woods*, 14 F.4th 544, 555 (6th Cir. 2021). First, that the Junk Yard Dogs were a racketeering "enterprise." *Id.* Second, that the Junk Yard Dogs "engaged in racketeering activity." *Id.* Third, that Baskerville "had a position in the enterprise." *Id.* Fourth, that Baskerville "committed the alleged crime[s] of violence." *Id.* And fifth, that his general purpose was to maintain and increase his position in the enterprise. *Id.*

Baskerville mounts challenges to only two of those elements. To begin, he argues that his and his codefendants' activities "cannot be described as racketeering activity." Baskerville Br. 10. In addition, Baskerville contends that he did not commit the alleged crimes because he "was not present at any of the crimes." *Id.* The facts and law foreclose both arguments.

*Racketeering Activity.* We first ask whether the Government proved that the Junk Yard Dogs gang engaged in racketeering activity. It did.

The Racketeering Act defines "racketeering activity" to include acts of murder that are punishable as felonies under state law. 18 U.S.C. § 1961(1)(A). Under Tennessee law, murder and attempted murder are "chargeable" acts "punishable by imprisonment for more than one year." *Id.* §§ 1959(b)(1), 1961(1)(A); *see* Tenn. Code Ann. §§ 39-13-202 (first degree murder), 39-12-101 (criminal attempt). So both acts meet the statutory definition of "racketeering activity."

And contra Baskerville's assertion, the evidence at trial left little doubt that the Junk Yard Dogs engaged in murder and attempted murder. Numerous witnesses, including high-ranking members privy to the gang's plans, testified about the role that violence—or in Junk Yark Dogs' parlance, "demonstrations"—played in preserving the gang's power and reputation. Their testimony, as well as corroborating evidence like phone records, amply confirmed the gang's execution of a spree of shootings spanning back to 2015. *See supra* pp. 2-7. Baskerville's effort to downplay the group's pattern of murders and attempted murders runs aground on the trial record.

*Crimes of Violence*.    We next consider whether the Government established that Baskerville himself "committed the alleged crime[s] of violence." *Woods*, 14 F.4th at 555.  To satisfy this element, the Government needed to prove his involvement in the murders and attempted murders that violated "the laws of any State or the United States."   18 U.S.C. § 1959(a).  Under Tennessee law, all agree, "[a] person is criminally responsible for an offense committed by the conduct of another, if" he "solicits, directs, aids, or attempts to aid another person to commit the offense."  Tenn. Code Ann. § 39-11-402(2).  So our inquiry asks whether the evidence established that Baskerville was criminally responsible, under Tennessee law, for the murder of Guy Williamson in 2015 and the murders and attempted murders of rival gang members in 2020.  We agree with the Government that its evidence was sufficient.

As a baseline, the trial evidence proved that Baskerville controlled the Junk Yard Dogs. Testimony emphasized that only gang members with the rank of Five or Three Star Universal Elite, like Baskerville, could give the order to shoot or kill someone.  In line with that hierarchy, many of the Junk Yard Dogs who testified at trial stated that Baskerville sat atop the gang's chain of command and directed the gang's activities.  Several gang members also explained that Baskerville, as Chief of the Streets, ordered hits and declared war, and Martivus, as deck holder, executed his orders.

What's more, the jury heard how Baskerville used texts to encourage the Junk Yard Dogs to maintain their reputation—especially through violent acts.  In the group chat used for "nation business," Baskerville liked a message from Smith that read, "We been setting trends they who be running [streets] and what the one and only demonstration is."  Exhibits, R.1096-1, PageID 9537, 9558.  He praised a gang member who thrashed someone for "talking s*** about us and being disrespectful." *Id.* at PageID 9552-53.  And after the leader of the Gangster Disciples was murdered in 2019, Baskerville texted the group, "Kill da head da body gone drop, p .. look at them GD out here lose like a mfer." *Id.* at PageID 9539.

Baskerville conveyed the same ruthless message in his one-on-one texts.  Once, a Junk Yard Dog representer reported rumors that the Gangster Disciples and Four Corner Hustlers were "sending a blackout squad out here to clean up Somerville and take care of us." *Id.* at PageID 9566.  Baskerville responded, "Tell them ni***s I said come western union." *Id.*

And the representer echoed those sentiments, adding he would "get at them b****es again . . . shipping body bags back to the land." *Id.*

Given Baskerville's role as Chief of the Streets, the evidence at trial firmly tied him to all the murders and attempted murders. That is true even accepting Baskerville's point that "he was not present at any of the crimes." Baskerville Br. 10.

Begin with the 2015 murder of Guy Williamson. Multiple gang members testified that Baskerville ordered them to collect Williamson and bring him back to District 15. Once Williamson was in hand, Baskerville ordered gang members to get rid of him. Williamson was found dead hours later.

Baskerville dictated actions similarly in the 2020 gang war. The jury heard testimony that it was Baskerville who declared war on the Gangster Disciples and the Four Corner Hustlers after their members shot a Junk Yard Dog on June 16, 2020. Multiple gang members testified that Baskerville and Martivus plotted the gang's course of action on June 17, 2020—the double-murder attempt on two members of the rival gangs. Martivus himself testified that Baskerville "ordered" him to go to "war" and told him "who to go to war with." Trial Tr., R.1005, PageID 5199; Trial Tr., R.1004, PageID 4873-74. And after the two conferred, Baskerville stood by Martivus's side as Martivus announced that the gang would "demonstrate" against Stefon McNeal and Willie Perry. Trial Tr., R.1004, PageID 4872-73, 4878.

Baskerville called for more attacks after the Gangster Disciples retaliated with the shooting at his home that injured Baskerville's mother. After the incident, he told Martivus that the "Gangster Disciples" knew "he had something to do with Stefon McNeal getting shot and they was going to get him for it." *Id.* at PageID 4883. Before they could, Baskerville decided that the Junk Yard Dogs should strike back. *Id.* He instructed Martivus to "continue" the war, commanding "kill or be killed." *Id.* at PageID 4881-83, 4887-89.

That instruction led to the shootings on August 9 and 10, where Junk Yard Dogs shot up the homes of two Gangster Disciples. Baskerville specifically tracked the hit on August 9, asking one of the gang members to send him a "text . . . when its done." Exhibits, R.1096-1, PageID 9532. The gang member replied, "The business took care of." *Id.* And Baskerville

followed up, "[w]hich spot," *id.*—a question that would allow a reasonable juror to infer that Baskerville knew about both hits.

Finally, on August 23, 2020, Baskerville ordered gang members to target Gangster Disciples rivals at the Dead End club. One partygoer testified that Baskerville, while inside the club, declared that he wanted to "air it out" and "demonstrate" on the Gangster Disciples. Trial Tr., R.1007, PageID 5614-16. Then, after Baskerville ordered the Junk Yard Dogs out of the club, one of the gang members testified that he told Teiona Lewis, "We ain't going to fight; we gonna shoot." Trial Tr., R.1050, PageID 8343. Martivus recalled that Baskerville stated that the Junk Yard Dogs couldn't let the Gangster Disciples "constantly . . . play with [them] like that." Trial Tr., R.1004, PageID 4912. Baskerville also expressed a desire to avenge the earlier shooting of his "[m]ama," adding "they ain't going to get away with it." *Id.*

Later, at the gas station, Baskerville spoke about the gang's plans with other members of the Junk Yard Dogs. He talked with Smith and Martivus inside the gas station before circling up with the rest of the gang outside. While they were huddled, Springfield filled the group in on the Gangster Disciples' location back at the Dead End. And Martivus testified that Baskerville told the group "to take care of it." *Id.* at PageID 4914. Although, at that point, Baskerville split off from the group to go home, the jury heard no shortage of evidence proving that he directed the gang to execute a shooting at the Dead End.

On top of that testimony, the Government introduced phone records establishing that Baskerville stayed in close contact with the Junk Yard Dogs during many of the hits. Before and after the two shootings on June 17, 2020, Baskerville called gang members sent to the homes of Stefon McNeal and Willie Perry. The same is true for the shooting on August 9, 2020, at Marius Williams's home. And Baskerville called one of the participants in the August 10, 2020, shooting that targeted Mardreques Payton; that call occurred right after the hit took place. The authenticity and timing of these calls are undisputed. The jury was entitled to believe that this evidence reflected Baskerville's knowledge and supervision of the attempted murders rather than coincidental contacts with the Junk Yard Dogs triggermen around the time of each shooting.

In short, there was abundant evidence to establish that Baskerville sat atop a racketeering enterprise, all while "solicit[ing]" and "direct[ing]" others to carry out murders to maintain his gang's position. *See* Tenn. Code Ann. § 39-11-402(2). A reasonable trier of fact could conclude as much—particularly viewing the evidence, as we must, in the light most favorable to the prosecution. *See Jackson*, 443 U.S. at 319.

*Baskerville's Counterarguments*. Baskerville pushes back on two fronts—involving in turn asserted disputes over the facts and witnesses' credibility. We reject both arguments.

*First*, Baskerville counters that the shooting at the Dead End on August 23 "was about a fight between Martivus Baskerville and his ex-girlfriend, Teiona Lewis, not related to any gang activity." Baskerville Br. 10-11. He adds that Martivus "indicated" on the stand "that he was upset [with Teiona Lewis] and that he wanted to kill Lewis[es]." Baskerville Br. 11.

That argument belies the record, which if anything shows the opposite. Martivus insisted that the shooting happened because "it was already going on with the Gangster Disciples." Trial Tr., R.1004, PageID 5035. As for Teiona Lewis, he explained, "I didn't shoot because of her. I shot because [of] what they did to my aunt and what was going on between the war with the Gangster Disciples." *Id.* at PageID 5036. That tracks testimony about the words of Baskerville that night, who was overheard stating that the Gangster Disciples "ain't going to get away with" the earlier shooting of his "[m]ama." *Id.* at PageID 4912.

*Second*, Baskerville argues that the testimony of four cooperating Junk Yard Dogs was "inconsistent and not credible." Baskerville Br. 13-14. Baskerville's asserted inconsistencies are unconvincing.

Baskerville first asserts that Martivus "did not actually answer any questions about any directives given to him by [Baskerville]." *Id.* at 13. But Martivus testified at length about the commands Baskerville gave him. A sampling: On June 17, 2020, Baskerville "ordered" Martivus to go to "war" and directed "who to go to war with"; later that summer, he commanded Martivus to "continue" the war, commanding "kill or be killed." Trial Tr., R.1005, PageID 5199; Trial Tr., R.1004, PageID 4873-74, 4881-83, 4887-89.

Baskerville next complains that one of the testifying Junk Yard Dogs, Deonte Walker, "did not hear [him] order anything." Baskerville Br. 13. But that point is consistent with witness testimony that it was Baskerville who gave the orders that Martivus executed—even if Baskerville communicated those orders only to Martivus outside of others' earshot. Gang bosses like Baskerville cannot "buffer[] themselves" from criminal responsibility by routing their commands through others at "lower tiers." *United States v. Zemlyansky*, 908 F.3d 1, 11 n.7 (2d Cir. 2018).

Baskerville also contends that Kamaria Kamurari, a member of the Junk Yard Dogs, "could not accurately remember who was in the car" en route to the Dead End club shooting on August 23, 2020. Baskerville Br. 13. But Kamurari testified that a Junk Yard Dog named Bianca Jackson drove Martivus, Montaveen Taylor, and Kamurari back to the Dead End to commence the murder attempt. That testimony was consistent with the statements of other witnesses.

*Third*, Baskerville points out that Jeremy Hall, a former Junk Yard Dog, testified that Michael Hobson shot Guy Williamson. Despite that testimony, the jury acquitted Hobson. In Baskerville's view, that acquittal undermines his own conviction for the Williamson murder. But Hobson offered an alibi for the day of the shooting, cast doubt on the DNA evidence linking him to the crime, and pointed out that other Junk Yard Dogs left District 15 with Williamson that day and had motive to blame Hobson for the crime. A reasonable jury could have believed both that Baskerville ordered the hit *and* that the Government failed to prove that it was Hobson, as opposed to another Junk Yard Dog, who actually pulled the trigger.

At day's end, "[c]hallenges to the credibility of a witness are not . . . challenges to the sufficiency of the evidence," but instead "to the quality of the government's evidence." *United States v. Latouf*, 132 F.3d 320, 330 (6th Cir. 1997). Each of the witnesses Baskerville attacks on appeal was cross examined by the defendants, who attempted to poke holes in their stories and cast doubt on their memories. Despite these attempts, the jury chose to believe the witnesses' testimony and convicted Baskerville on all counts. In this context, we cannot "substitute [our] opinion" of the evidence—or Baskerville's—"for that of the jury." *Id.* at 331. Baskerville's convictions stand.

B

Smith, for his part, attacks the sufficiency of the evidence to support his conviction for racketeering conspiracy. His challenge likewise lacks merit.

A racketeering conspiracy requires proof of four elements: (1) that an enterprise existed; (2) that the enterprise was engaged in, or that its activities affected, interstate commerce; (3) that the defendant was employed by or associated with the enterprise; and (4) that the defendant conspired to "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c)-(d). On appeal, Smith does not take issue with the first three requirements. That leaves only the question whether the Government adequately linked Smith to a "pattern of racketeering activity," as needed to sustain his conspiracy conviction.

On that score, some additional background is helpful. A "pattern of racketeering activity," as defined by statute, requires evidence of "at least two" predicate "acts of racketeering activity." *Id.* § 1961(5). But a defendant's required connection to those acts varies depending upon the charge. For a jury to convict on a *substantive* racketeering charge, the evidence must establish that the defendant *himself* committed at least two predicate acts. By contrast, a racketeering *conspiracy* charge requires proving only that the defendant "agreed" that *at least one member of the conspiracy* would commit at minimum "two predicate acts." *United States v. Hills*, 27 F.4th 1155, 1174 (6th Cir. 2022). The defendant, in other words, must have "intended to further an endeavor which, if completed, would" have resulted in the commission of two offenses. *United States v. Householder*, 137 F.4th 454, 470, 486 (6th Cir. 2025) (internal quotation marks omitted). That standard is met if a defendant "adopt[s] the goal of furthering or facilitating the criminal endeavor," *Salinas v. United States*, 522 U.S. 52, 65 (1997), and agrees to join it, *United States v. Gardiner*, 463 F.3d 445, 457 (6th Cir. 2006). This intent may be direct or inferred, and the agreement may be formal or informal. *Id.*

Plentiful trial evidence showed that Smith "intended" to further the Junk Yard Dogs' endeavor and either committed or agreed with the resulting acts of violence. *See Householder*, 137 F.4th at 470. The endeavor? Protecting the power, territory and reputation of the Junk Yard

Dogs.  The violent predicate acts?  At a minimum, the two shootings on June 17, 2020, and the shooting at the Dead End club on August 23, 2020, all of which resulted in several attempted murder convictions.

*The Endeavor.*  Evidence established Smith's commitment to the Junk Yard Dogs' goal of dominating other gangs through acts of violence.  He was a dedicated member of the gang, obtaining the rank of a Five Star Branch Elite and acting as second in command to Martivus Baskerville, the "deck holder."  Trial Tr., R.1004, PageID 4853-54, 4994, 4997.  Smith also vocalized his support for the gang's violent pursuits in the gang's group chat, boasting that "[w]e been setting trends they who be running [streets] and what the one and only demonstration is." Exhibits, R.1096-1, PageID 9558.  And he "loved" another member's message pledging to "smash & crush" "[t]hose who try to walk upon" the Almighty Vice Lord Nation.  *Id.* at PageID 9544.

As discussed next, Smith didn't stop with words.  He showed agreement with orders to protect the Junk Yard Dogs' reputation by committing and being present for the planning of multiple attempted murders of gang rivals.  Under our precedent, this evidence is sufficient to show that Smith "adopted the goal of furthering" the Junk Yard Dogs' criminal endeavor. *Salinas*, 522 U.S. at 65; *see also, e.g.*, *United States v. Tisdale*, 980 F.3d 1089, 1096 (6th Cir. 2020) (evidence that defendant held rank in a gang, paid dues, participated in gang meetings, advertised his membership, and actively participated in robberies sufficient for a jury to "find that he advanced the gang's interests"); *United States v. Ledbetter*, 929 F.3d 338, 351 (6th Cir. 2019) (same where the evidence proved defendant's gang membership and role in directing retaliatory acts of violence).

*Attempted Murder of Willie Perry.*  Smith's personal commission of predicate acts was not required to convict him for racketeering conspiracy.  *See supra* p. 19.  Still, the Government proved that Smith himself committed attempted murder when he drove shooters to target rival Willie Perry on June 17, 2020.  Smith does not contest that "the [G]overnment had sufficient evidence of his involvement as a getaway driver" for this crime.  Smith Reply 6.  That's predicate act one.

*Additional Predicate Acts.*   Evidence of Smith's involvement with additional predicate acts abounded at trial.

Start with the attempted hit on Stefon McNeal on June 17, 2020—the same night Smith drove Junk Yard Dogs members to target Willie Perry.   Witnesses placed Smith at the emergency meeting at the gang's District 15 headquarters that night.   As a reminder, that meeting followed the prior day's Junk Yard Dogs-Gangster Disciples altercation that led to the shooting of one Junk Yark Dogs member.   Speaking to those gathered at District 15, Baskerville declared war on the Gangster Disciples and Four Corner Hustlers.   Martivus then announced the group's retaliatory intentions to the rest of the Junk Yard Dogs while Baskerville stood by his side.   The decided course was to immediately respond by targeting rival gang members Willie Perry *and* Stefon McNeal.

Trial evidence showed that Smith was aware of the plans for both hits and played a direct part in carrying out one.   Junk Yard Dogs member Davaraus Worrles testified that Smith told him "[a]bout what was fixing to go down" during the meeting.   Trial Tr., R.1012, PageID 6390-91.   Smith and Worrles executed the hit on Perry's home.   But Worrles knew that another car of gang members was "go[ing] to Whiteville," where Stefon McNeal lived, because "Smith" told him about it.   *Id.* at PageID 6393-94.   Smith thus attended the meeting where Junk Yard Dogs leaders commanded the targeting of both Perry and McNeal.   He then drove a group to execute the shooting of Perry, while at the same time showing knowledge of the planned simultaneous hit on McNeal.   That was sufficient for a jury to conclude that Smith agreed that other Junk Yard Dogs should attempt to murder McNeal.   That's predicate act two.

Still more predicates stem from the August 23, 2020, shooting at the Dead End.   Smith attended the party that night with Baskerville and many other Junk Yard Dogs members.   When Baskerville ordered the Junk Yard Dogs out of the club—while threatening that he wanted to "air it out" and "demonstrate"—Smith walked out with him.   Trial Tr., R.1007, PageID 5614, 5566-67.   Outside the club, Baskerville threatened "[w]e not gonna fight, we gonna shoot" when Teiona Lewis asked to fight one of the female Junk Yard Dogs.   Trial Tr., R.1050, PageID 8343.   And later, Smith was spotted by an open car trunk with Baskerville and Martivus, where the

three men "pass[ed] something to each other" with a "cover . . . over it" and put it "in the backseat." Trial Tr., R.1007, PageID 5567.

Soon after, at the gas-station meeting, Smith spoke with Baskerville and Martivus inside. He then circled up with the rest of the gang outside. While there, the group worked out various aspects of their plan: Martivus asked gang members to demonstrate with him at the Dead End, Springfield described the Gangster Disciples' location, and Baskerville gave instructions to "take care" of the problem. Trial Tr., R.1004, PageID 4914-15. Then, as most of the Junk Yard Dogs headed back to the club, Smith escorted Baskerville's car home to ensure Baskerville's protection.

Taken together, significant evidence about the night of August 23, 2020, implicates Smith and shows his agreement with plans to shoot up the Dead End to target rival gang members. Among other findings, a rational juror could conclude: that Smith heard Baskerville's statements that he wanted to "air it out," "demonstrate," and "shoot"; that Smith was present when Baskerville instructed Martivus about returning to the Dead End club to execute a hit on the Gangster Disciples; that Smith was present when Martivus and Springfield discussed attack plans at the gas station; and that Smith helped facilitate Baskerville's safety during the planned attack by escorting him back home consistent with gang protocol. What's more, the cellphone data showed that Smith placed calls to other gang members, including Springfield (one of the shooters), before and after the shooting. Those events form predicate act three-plus. The above-cited evidence was more than enough to sustain Smith's conspiracy conviction.

*Smith's Counterargument.* Smith does not meaningfully contest the evidence that connects him to these three shooting events. Instead, Smith claims the Government has improperly shifted theories by focusing on the shootings rather than on the other predicate act—namely, drug trafficking—it associated with him in the indictment and at closing arguments. We are not persuaded.

The Government did not rest its conspiracy charge exclusively on Smith's personal involvement in the attempted murder of Willie Perry and drug trafficking. The indictment, to be sure, associated those specific acts with Smith personally. But it went on to more broadly allege

that the Junk Yard Dogs "conspired" to conduct the group's affairs through "a pattern of racketeering activity" made up of various offenses. Superseding Indictment, R.280, PageID 648. Those predicate acts included various murders and attempted murders, along with drug trafficking. And the Government's indictment cited all of those predicates as a basis for each defendant's conspiracy charge.

During its closing arguments, the Government explained the relationship between the predicate acts and the conspiracy count. The prosecutor stated that the Government needed to prove that each defendant "knowingly agreed that a conspirator would commit at least two acts," not that the defendant himself "committed the racketeering acts." Trial Tr., R.1016, PageID 7160. According to the prosecutor, the Government had carried its burden not only by proving that "each" defendant "agreed that somebody else would" commit two predicate acts—alone sufficient to convict on the conspiracy charge. *Id.* It also had shown that "each one" of the defendants "committed two or more acts of racketeering activity" himself. *Id.* For Smith, the prosecutor contended that those acts were "attempted [murder], conspiracy to commit murder, [and] drug distribution." *Id.* at PageID 7161. The Government nowhere contended that Smith's personal involvement in drug trafficking was necessary to obtain a conspiracy conviction.

The jury instructions and verdict form reflected the Government's position. The jury instructions explained that the conspiracy charge was supported by a defendant's agreement "that a conspirator" would "commit . . . two or more of the racketeering acts" alleged "in the indictment." Trial Tr., R.1015, PageID 7084-98. Put another way, the instructions clarified that "any combination" of two or more predicate acts sufficed to convict Smith as long as he agreed a coconspirator "did or would" commit them. *Id.* at PageID 7094, 7097. On top of that, Smith also agreed to a general verdict form for the conspiracy charge. That form simply asked the jury to check "guilty" or "not guilty" as to whether Smith was guilty of racketeering conspiracy. Smith Verdict Form, R.807, PageID 3417. So the verdict form did not require the jury to find that Smith personally committed specific overt acts to convict him on that count.

A general jury verdict is valid if "sufficient evidence supports one of the grounds of conviction." *United States v. Mari*, 47 F.3d 782, 786 (6th Cir. 1995) (citing *Griffin v. United States*, 502 U.S. 46, 55-56 (1991)); *accord Sochor v. Florida*, 504 U.S. 527, 538 (1992).

So Smith errs to the extent that he asserts we can sustain his conspiracy conviction only if the Government proved his involvement in gang-related drug trafficking.  Instead, we need only conclude that the evidence sufficiently showed that Smith agreed that "at least one of the coconspirators" would commit any "two predicate acts."  *Hills*, 27 F.4th at 1174.  As discussed, the Government carried that burden as it related to several predicate acts of attempted murder—first, by proving that Smith agreed to and then participated in the attempt on Willie Perry's life, and, second, by proving that Smith agreed that his coconspirators should attempt to murder Stefon McNeal on June 17, 2020, and various Gangster Disciples members at the Dead End on August 23, 2020.  That means Smith's conspiracy conviction stands.

III

Springfield, Smith, and Baskerville next assert that the district court's approach to the suspected jury intimidation violated their Sixth Amendment right to an impartial jury.  They do so from different directions.  Springfield and Smith newly insist that the district court should have individually questioned jurors to probe any potential bias—despite discouraging that option during the trial.  Baskerville instead contends, as he did before the district court, that a mistrial was required.  Smith advances the mistrial argument in the alternative.

We address defendants' contentions about individual-juror questioning and a mistrial in turn.[1]  Neither line of argument succeeds.

A

For the first time on appeal, Springfield and Smith argue that Sixth Amendment principles required the district court to individually interview each juror to assess potential bias, rather than rely on its questioning of the foreperson.  That new argument thus seeks to second guess the same course of conduct that several defense counsel encouraged below.  Springfield and Smith's belated individual-questioning attack fails.

---

[1]In his brief, Baskerville raised the mistrial challenge only.  It wasn't until oral argument that Baskerville posited that individual-juror questioning may have been warranted.  Springfield's mistrial argument also arrived tardy; he waited until his reply brief to run it.  Both attempts come too late for our consideration.  *See United States v. Bender*, 265 F.3d 464, 475 (6th Cir. 2001); *American Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 477 (6th Cir. 2004).  But for reasons we explain, each argument would fail on the merits regardless.

1

The Sixth Amendment guarantees a criminal defendant's right to be tried by "an impartial jury." U.S. Const. amend. VI.  That right has been interpreted to protect against jurors' personal conflicts of interest or exposure to pretrial publicity that could prejudice their consideration of a case.  *See, e.g.*, *Skilling v. United States*, 561 U.S. 358, 380 (2010); *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984); *Treesh v. Bagley*, 612 F.3d 424, 437 (6th Cir. 2010).  And, most relevant here, the impartial-jury right covers instances where jurors are subject to outside intrusions on their deliberative process—like a "private communication, contact, or tampering." *Remmer v. United States*, 347 U.S. 227, 229 (1954).

Such external contact implicates "[t]he theory of our trial system that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence." *Skilling*, 561 U.S. at 378 (citation modified).  That is of course true when a juror himself attempts to discuss a case with outside contacts.  But risk of impermissible juror interference also follows when jurors encounter external influences through no fault of their own. *See, e.g.*, *United States v. Pennell*, 737 F.2d 521, 529 (6th Cir. 1984) (anonymous caller contacted jurors in their homes); *United States v. Mack*, 729 F.3d 594, 605-06 (6th Cir. 2013) (FBI agents accidentally discussed case near a juror during a lunch break).

To safeguard the integrity of criminal trials, district courts are therefore charged with investigating potential juror interference.  "When there is a credible allegation of extraneous influences, the court must investigate sufficiently to assure itself that constitutional rights of the criminal defendant[s] have not been violated." *United States v. Rigsby*, 45 F.3d 120, 124-25 (6th Cir. 1995).  Such investigation should probe the "circumstances" of the contact, "the impact" on the affected jurors, and "whether or not it was prejudicial." *Remmer*, 347 U.S. at 229-30.

After investigating, a district court might conclude that "credible evidence" shows that external contact "presents a likelihood" of affecting "the verdict." *United States v. Kechego*, 91 F.4th 845, 850 (6th Cir. 2024) (citation modified).  In such cases, district courts are to provide defendants a "meaningful opportunity" to prove that the external contact has indeed led to juror bias. *United States v. Herndon*, 156 F.3d 629, 637 (6th Cir. 1998); *see Smith v. Phillips*, 455

U.S. 209, 215 (1982).  Such proceedings are commonly referred to as *Remmer* hearings, *see Herndon*, 156 F.3d at 637, drawing their name from *Remmer v. United States*, 347 U.S. 227 (1954).

As with other questions of trial-level procedure, district courts have leeway to craft and conduct appropriate inquiries under *Remmer*.  "[S]ince the trial judge is in the best position to determine the nature and extent of alleged jury misconduct, his decision on the scope of proceedings necessary to discover misconduct is reviewed only for an abuse of discretion." *Rigsby*, 45 F.3d at 124-25 (quoting *United States v. Shackelford*, 777 F.2d 1141, 1145 (6th Cir. 1985)).  Such deferential review, we've noted, "serves at least two important functions." *United States v. Taylor*, 814 F.3d 340, 348 (6th Cir. 2016), *abrogated on other grounds by United States v. Richardson*, 948 F.3d 733, 741 (6th Cir. 2020).  First, it recognizes that "district courts are uniquely qualified" to craft trial procedures and assess jurors' demeanor, credibility, and assurances of impartiality.  *Id.*  Second, discretion is the "only alternative to the sort of bright-line rule" mandating juror questioning in all cases—even when such questioning might "actually exacerbate" juror bias by "unnecessarily highlighting the communication in the eyes of the jurors." *Id.* (quoting *Mack*, 729 F.3d at 606).

When forfeiture or waiver enters the picture, our standard of review relaxes further.  If a defendant forfeits—or fails to timely assert—his rights, we review for plain error. *United States v. Olano*, 507 U.S. 725, 733-34 (1993).  If a defendant waives—or intentionally relinquishes or abandons—his rights, we cannot review his challenge.  *Id.* at 733.  Both play a role here.

2

According to Springfield and Smith, the district court erred by failing to individually question each juror about the suspected jury intimidation.  But Springfield waived his challenge by arguing *against* jury questioning.  So we cannot entertain his change in course now.  Smith at best forfeited any request for individual questioning of the jurors.  So his appellate argument prompts the plain-error standard, which he cannot surmount.

*Waiver.*  Start with Springfield's waiver.  The district court, recall, proposed "touch[ing] base with each of the jurors individually" to probe their views on the alleged intimidation.

It then received strong pushback from defense counsel.   After moving for a mistrial, Baskerville's attorneys expressed fears that questioning the jurors individually would "further" any prejudicial "taint."  Trial Tr., R.1055, PageID 8971.**²**  Later, Baskerville's counsel reiterated that there was no "need to do individual conferences right now."  *Id.* at PageID 8978.   An attorney for Springfield agreed, stating, "I think we've done enough. . . . Let the [jury] deliberate. Quit interfering with them."  *Id.* at PageID 8975.   Later, he again urged the district court to "leave" the jury "alone."  *Id.* at PageID 8977.

Springfield, through counsel, thus "agreed" that the jury should keep deliberating without individual questioning.  *United States v. Perry*, 438 F.3d 642, 651 (6th Cir. 2006).  That course may have reflected a mistrial-or-nothing strategy call.  Or it could have stemmed from concerns about "highlighting" the suspected intimidation.  *Taylor*, 814 F.3d at 348 (citation modified). Either way, "[a]n attorney cannot agree in open court with a judge's proposed course of conduct and then charge the court with error in following that course."  *Perry*, 438 F.3d at 651 (citation omitted).  So having pushed against juror questioning in the district court, Springfield waived any *Remmer* objection he might have had to the district court's choice to heed his request and refrain from individual questioning of each juror.  *Id.*; *see also United States v. Vining*, 224 F. App'x 487, 493 (6th Cir. 2007) (similar).

*Plain-Error Review*.   Smith asserts that we should review his *Remmer* challenge for abuse of discretion, not plain error.  He says that is so because defense counsel "clearly raised" concerns about the "influence of the perceived threats" on the jury.  Smith Reply 8-9.  The Government counters that plain-error review attaches because Smith at best forfeited his *Remmer*-based argument by failing to seek questioning of individual jurors.

We agree with the Government that plain-error review governs Smith's *Remmer* arguments.  Despite Smith's characterization, the question here for preservation purposes is not *whether* the allegations of intimidation warranted investigation; they did, as the district court recognized.  The question is *how* Smith and other defendants urged the district court to proceed. And on that front, the only argument that Smith preserved was one for a mistrial.

---

**²**As such, Baskerville also waived his asserted rights under *Remmer* (in addition to forfeiting the argument on appeal by failing to raise it until oral argument, *see supra* n.1).

Smith's attorney did not object when the district court agreed, upon several defense attorneys' request, to forgo individual juror questioning in favor of interviewing the foreperson. Nor did Smith himself seek individual juror questioning at any other point. *See supra* pp. 8-11. If anything, Smith's counsel seemed to agree with the other attorneys' objection to individual questioning; she noted that defense counsel "made very valid points" and urged against action that risked further jury "taint." Trial Tr., R.1055, PageID 8972-73.

Smith cites no *Remmer* case in which we've applied abuse-of-discretion review on facts like these. Instead, the Government's proposed course appears common. We've applied plain-error review to *Remmer*-hearing arguments when defendants preserved only requests for mistrials, not questioning. *E.g.*, *Kechego*, 91 F.4th at 850; *United States v. Walker*, 160 F.3d 1078, 1083 (6th Cir. 1998). And we've emphasized that a "defendant who waits until appeal to request a hearing bears a heavy burden" of showing plain error based on the absence of a hearing. *Mack*, 729 F.3d at 606 (quoting *Walker*, 160 F.3d at 1083). That's because such a delayed request "effectively deprive[s] this court of any basis for concluding that a hearing would be necessary, and asks us to presume that the district court would not have acceded to such a request, and would have done so for erroneous reasons." *Id.* (quoting *Walker*, 160 F.3d at 183). We decline to chart a new path that would reward appellate about-faces like Smith's.[3]

We therefore turn to a plain-error analysis. Smith "must show (1) an error, (2) that was obvious or clear, (3) that affected his substantial rights, and (4) that affected the fairness, integrity, or public reputation of his judicial proceedings." *United States v. Jackson*, 154 F.4th 422, 431 (6th Cir. 2025) (citation omitted). "An error is clear or obvious only when the law is 'settled,' 'rather than subject to reasonable dispute.'" *Kechego*, 91 F.4th at 850 (citation omitted) (quoting *Henderson v. United States*, 568 U.S. 266, 269 (2013); *Puckett v. United States*, 556 U.S. 129, 135 (2009)). That "is a demanding standard, met only in exceptional circumstances." *Id.* Smith has not satisfied it.

We have already detailed the district court's relevant investigatory efforts. Upon learning of the alleged incidents of external interference, the district court recognized and sought to

---

[3]If Springfield did not waive his individual-questioning argument, he at best forfeited it. So plain-error review would apply to his challenge too. And he would fail plain-error review for the same reasons Smith does.

discharge its duties to assess the nature and impact of the alleged incidents on the jury. It engaged in steps that involved discussions with counsel, interviews of the foreperson, and polling the jury. *See supra* pp. 7-11. Those juror-facing interactions in turn indicated that the jury carried out their deliberations impartially and without reference to the external contact.

Still, Smith contends that *Remmer* required the district court to engage in individual questioning of each juror sua sponte—notwithstanding defense counsel's opposition to such questioning. And it might be that, in hindsight, individual questioning "would have been preferable." *Taylor*, 814 F.3d at 351. But even if we spotted Smith that much, a district court's failure to follow best practices "is not the same thing" as committing a plain error. *Id.*

Instead, Smith must establish that any *Remmer* error was "clear or obvious under current law, and not subject to reasonable dispute." *United States v. Whitson*, 77 F.4th 452, 461 (6th Cir. 2023) (citation modified). That standard is met "only if the error was so plain that the trial judge was 'derelict in countenancing it.'" *United States v. Tellez*, 86 F.4th 1148, 1154 (6th Cir. 2023) (quoting *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc)). That is, the district court must have acted "clearly contrary to the law at the time of appeal." *Id.* (citation omitted).

Smith cannot make that showing on this record. "All that *Remmer* requires is that the defendant be *given an opportunity* to prove juror bias." *Taylor*, 814 F.3d at 351 (emphasis added). Smith says that the absence of individual-juror questioning denied him that opportunity. But again, the district court expressly *proposed* questioning each juror individually, only to have multiple defense counsel *object* to that course as potentially prejudicial.

The district court then sought to discharge its investigatory duty while heeding defendants' requests. It did so initially by twice interviewing the foreperson to obtain confirmation that the jury could proceed fairly. The foreperson, who the district court believed was acting as an effective representative, confirmed that the jury had agreed to set aside the external contacts and deliberate impartially. The district court further stressed with the foreperson that the jurors should make no "assumption[s] about where" the alleged threats were "coming from." Trial Tr., R.1055, PageID 8984. The foreperson reported that the jury had

agreed on that same point.  The district court later polled each juror individually to ensure he or she voted "based on the facts, evidence, and law . . . and nothing else."  Trial Tr., R.1056, PageID 9010-14.  Each juror answered "yes" in open court.  *Id.*  And as the district court noted, the verdict itself—which rendered acquittals as to particular counts and defendants—reflected "very careful" parsing of the evidence rather than treatment stemming from partiality.  *Id.* at PageID 9016-17.

To prevail, then, Smith must show that our cases clearly barred the district court's attempt to balance its investigatory duties against defendants' objection to individual juror questioning as unduly prejudicial.  On this trial record, Smith "comes up well short of this high bar."  *Tellez*, 86 F.4th at 1154.

For starters, Smith's assertion about what *Remmer* clearly required—sua sponte, individual questioning of jurors by the district court—stumbles on our caselaw.  Applying *Remmer*, we have affirmed district courts' varying approaches to topics spanning from who conducts juror questioning, to who gets questioned, to how questioning occurs.[4]  That range belies that there is a clearly mandated one-size-fits-all format for assessing external jury interference.

Smith counters with two cases—*United States v. Corrado*, 227 F.3d 528 (6th Cir. 2000) (*Corrado I*), and *United States v. Davis*, 177 F.3d 552 (6th Cir. 1999)—that he reads to establish a "duty to order" a hearing with individual questioning "sua sponte."  Smith Reply 9.  But neither bears the weight Smith says.  Each case confronted the district court's failure to permit *any* meaningful investigation into the impact of alleged external interference on the jury.  The cases thus stem from outlier scenarios that set no "clear or obvious" rule applicable to the district court's investigation of bias on this factual record.  *Whitson*, 77 F.4th at 461 (citation omitted).

---

[4]*See, e.g.*, *Taylor*, 814 F.3d at 346-47 (district court conducted ex parte juror interviews); *United States v. Zelinka*, 862 F.2d 92, 96 (6th Cir. 1988) (district court interviewed all jurors); *Pennell*, 737 F.2d at 529-30 (district court questioned five jurors individually and then questioned a single juror in front of counsel); *United States v. Ramos*, 861 F.2d 461, 464 (6th Cir. 1988) (counsel and court interviewed single juror); *United States v. Corrado*, 304 F.3d 593, 605 (6th Cir. 2002) (*Corrado II*) (district court had discretion to choose between in camera and open-court proceedings and to limit counsel's questioning).

Start with *Davis*. There, a juror who had done business with some of the defendants asked to be excused from jury service because he feared for his safety. 177 F.3d at 556. Moreover, he expressed these concerns to the other jurors. *Id.* Rather than investigate, the district court simply discharged the troubled juror and went on with the case without "investigat[ing] the scope of the problem" or probing the remaining jurors' impartiality. *Id.* We remanded for a *Remmer* hearing because neither the district court nor our Court "had any basis for concluding that the extraneous communications were harmless." *Id.* at 557.

*Corrado I* likewise found lacking the district court's response to alleged juror interference. The district court knew of allegations that a juror was offered a bribe to acquit defendant Corrado. 227 F.3d at 535. Yet the district court did not perform any juror interviews. Instead, the district court merely "directed three broadly worded questions to the jury as a group and instructed any jurors who" felt they could not remain impartial "to send the judge a note." *Id.* at 534, 536. The district court's "'minimalist' approach," we held, "was an inadequate response to the serious and credible allegations of extraneous influences on the jury." *Id.* at 536. And defendants there had "stated their objections to the district court's three-question proposal." *Id.* at 535. We concluded that the proceedings presented "the unusual case" requiring a "sua sponte" hearing on bias. *Id.* at 536.

*United States v. Lanier*, 870 F.3d 546 (6th Cir. 2017) (*Lanier I*), which Springfield cites, comes no closer to establishing plain error.[5] As with *Davis* and *Corrado I*, the background and juror misconduct prompting *Lanier* make that case far afield from this one. Our first intervention in *Lanier* came after the district court, over defendants' objection, refused any investigation into claims that a juror had sought guidance from a state-prosecutor friend about the case. 870 F.3d at 548. On appeal, we noted that the district court's failure meant "no one has ever questioned *any member* of the jury" to probe the "extent of the juror's misconduct" or "what impact" it had "on the rest of the jury." *Id.* at 550 (emphasis added). We therefore remanded for a *Remmer* hearing. *Id.* at 551. Yet on remand, the district court "compounded its initial error" by

---

[5]Springfield also cites a sampling of out-of-circuit cases, which cannot establish plain error. *See United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015) (explaining that an error is plain only if "*binding* case law" makes it clear (emphasis added)).

conducting a "minimally adequate" investigation, failing to inform the defendants about further misconduct from the implicated juror, and permitting delay that enabled the juror to destroy critical records of her external communications. *United States v. Lanier*, 988 F.3d 284, 296-97 (6th Cir. 2021) (*Lanier II*). We concluded that the district court's course of action had "shackled" defendants' investigation and denied them a "*meaningful*" opportunity "to satisfy their burden to demonstrate jury bias." *Id.* at 297. That "unusual posture" led us to grant a new trial. *Id.* at 298.

The significant failings that led to relief in *Davis*, *Corrado I*, and *Lanier I* and *II* are absent from the district-court proceedings presently on review. The district court did not proceed without "investigat[ing] the scope of the problem" or take only a "minimalist" approach of generally worded questions in open court. *Davis*, 177 F.3d at 556; *Corrado I*, 227 F.3d at 535. Nor did the district court fail to question "any member of the jury," *Lanier I*, 870 F.3d at 550, or "rob [defendants] of an adequate chance to demonstrate any jury bias" by denying them notice or an ability to investigate, *Lanier II*, 988 F.3d at 297. To the contrary, the district court involved defendants at every step of the investigation, twice interviewed the foreperson on the record, credited the foreperson's repeated assurances of juror impartiality, confirmed that the jury had not attributed the alleged intimidation to any defendant, and was "persuaded" by *defendants* not to individually question the remaining jurors. Trial Tr., R.1055, PageID 8979.

In sum, on these facts, no decision from our Court makes it "obvious or clear" that the district court committed *Remmer* error by failing to question jurors individually over defendants' objections. *United States v. Johns*, 65 F.4th 891, 893 (6th Cir. 2023). So no plain error justifies reversal on *Remmer* grounds.

B

Citing the suspected incidents of jury intimidation, Smith and Baskerville argue that the district court abused its discretion when it denied their motions for mistrial. We disagree.

1

We first address the parties' dispute over the applicable standard for proving mistrial-worthy bias stemming from jurors' external contacts.  The Government contends that our caselaw places the burden on defendants to prove that any such contact resulted in actual bias.  Smith objects to placing the bias burden on defendants.  He asserts that any external contact with jurors should instead trigger a so-called *Remmer* presumption, under which juror bias is presumed and must be rebutted by the Government.  347 U.S. at 229.  And he says that applying the proper presumption here would warrant a mistrial.

The Government has the better of what our precedents instruct.  Since *United States v. Pennell*, 737 F.2d 521 (6th Cir. 1984), we have rejected applying a "presumptive prejudice standard" to "unauthorized communications with jurors," *id.* at 531-32.  In reaching that rule, *Pennell* read the Supreme Court's decision in *Smith v. Phillips*, 455 U.S. 209 (1982), to establish two important principles governing district courts' investigation of potential juror interference. *First*, *Phillips* instructs that the "remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."  *Id.* at 215.  Citing that passage, we've concluded that the "burden of proof rests upon a defendant to demonstrate that unauthorized communications with jurors resulted in actual juror partiality.  Prejudice is not to be presumed." *Pennell*, 737 F.2d at 532.  *Second*, we've understood *Phillips* to direct deferential review, meaning that "a district court's decision not to grant a mistrial after investigating allegations of unauthorized contact with jurors should be reviewed only for abuse of discretion."  *Id.* at 533.

We've long applied those review rules when assessing claims based on the impartial-jury right.  We have generally placed the burden on defendants to prove jurors' actual bias—that is, bias in fact—while reiterating that "no presumption of prejudice arises from" alleged external contact.  *United States v. Sturman*, 951 F.2d 1466, 1478 (6th Cir. 1991); *see, e.g.*, *United States v. Rugiero*, 20 F.3d 1387, 1390 (6th Cir. 1994) ("[T]he defendant bears the burden of proving actual juror bias." (citation omitted)); *Davis*, 177 F.3d at 557 ("[N]o presumption of prejudice arises merely from the fact that improper contact occurred."); *Phillips v. Bradshaw*, 607 F.3d 199, 223 (6th Cir. 2010) ("[T]he burden rests upon the defendant to demonstrate prejudice."). And we've instructed that a district court's assessment of whether to declare a mistrial is

reviewed under the "highly deferential" abuse-of-discretion standard. *United States v. Owens*, 426 F.3d 800, 805 (6th Cir. 2005).

In response, Smith contends that we should pivot from our precedents and start presuming prejudicial bias as a default rule in external-contact cases. For support, he relies principally on *United States v. Olano*, 507 U.S. 725 (1993). In *Olano*, the Supreme Court reviewed for plain error a district court's decision to allow alternative jurors to attend jury deliberations. *Id.* at 727. After refusing to presume prejudice, the *Olano* Court held that the defendant had failed to prove actual bias and so rejected his claim. *Id.* at 739-40. It nonetheless reserved that "there may be cases where an intrusion" on jurors "should be presumed prejudicial." *Id.* at 739. That passage, Smith says, warrants revisiting our requirement that defendants typically must prove actual bias in jury-interference cases.

Smith's *Olano*-based argument does not bear out. To begin, the caselaw we now apply has coexisted with *Olano* for decades. *See, e.g.*, *Corrado II*, 304 F.3d at 600 n.5, 603 (burden on defendant to prove prejudice at *Remmer* hearing focused on allegations of and media reports about juror tampering); *Taylor*, 814 F.3d at 345, 346, 351 (same where jurors were exposed to media reports that the defendant called them "racist rednecks"); *United States v. Fox*, 134 F.4th 348, 376-77 (6th Cir. 2025) (same where juror was alleged to have contacted third party about defendants' guilt and his desire to "hang them"). Smith thus provides no new justification for revisiting our settled approach requiring defendants to prove actual bias.

We also reject Smith's premise—that declining to presume prejudice here would conflict with *Olano*—on its own terms.[6] "The Supreme Court has never held explicitly that courts may infer or presume bias" from external contact. *United States v. Frost*, 125 F.3d 346, 380 (6th Cir. 1997). And best we can tell, the Supreme Court hasn't presumed juror bias in any relevant

---

[6]We also respectfully disagree that our caselaw violates some lockstep approach to assessing bias that "[e]very other circuit" employs. *Lanier II*, 988 F.3d at 295 n.13. The D.C. Circuit, for instance, appears to give district courts discretion to decide whether any "particular intrusion showed enough of a likelihood of prejudice to justify assigning the government a burden of proving harmlessness." *United States v. Williams-Davis*, 90 F.3d 490, 496-99 (D.C. Cir. 1996) (citation omitted). The Fifth Circuit has written "that the *Remmer* presumption of prejudice cannot survive *Phillips* and *Olano*" and applies a similar standard to the D.C. Circuit. *United States v. Sylvester*, 143 F.3d 923, 934 (5th Cir. 1998). And even among those circuits that generally employ a presumption of prejudice, some have questioned whether "implied bias remains a viable doctrine following the Supreme Court's majority opinion in *Smith v. Phillips*." *Conner v. Polk*, 407 F.3d 198, 206 n.4 (4th Cir. 2005).

context since the 1960s. *See Sheppard v. Maxwell*, 384 U.S. 333, 352-55, 357, 363 (1966); *Parker v. Gladden*, 385 U.S. 363, 365 (1966). That incudes in *Olano*, which applied an actual-bias rule requiring defendants to make a "specific showing" that deliberations were affected by external interference. 507 U.S. at 739-40. We fail to see how it defies *Olano* to employ *Olano*'s actual-bias approach.

True, as Smith notes, *Olano* left open that "[t]here may be cases where an [outside] intrusion should be presumed prejudicial." *Id.* at 739. And at least some of our cases have followed suit. They've reserved the question whether a presumed-prejudice rule might trigger in "extreme or exceptional cases" involving some "relationship" between jurors "and some aspect of the litigation." *Johnson v. Luoma*, 425 F.3d 318, 326 (6th Cir. 2005) (citation omitted).[7]

Whatever window *Olano* might leave for sometimes presuming bias, this case falls outside of it. Consider our caselaw. Drawing from Justice O'Connor's discussion of the issue in her *Phillips* concurrence, we've set out the kinds of "extreme situations" that might warrant application of a presumed-prejudice rule (assuming it is "still viable"). *Johnson*, 425 F.3d at 326. They include "that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *English v. Berghuis*, 900 F.3d 804, 816 (6th Cir. 2018) (quoting *Phillips*, 455 U.S. at 222 (O'Connor, J., concurring)). We've posited that significant juror misconduct, such as "ly[ing] materially and repeatedly," might qualify too. *Johnson*, 425 F.3d at 326-27.

This case bears none of those hallmarks. It does not fall into the categories of cases we've expressly enumerated. Nor does it involve any analogous allegations of juror conflicts of interests with the case's subject matter or particular parties. The nature of the exposure itself, moreover, does not involve substantive disclosures about the case or threats explicitly associated with one side; on the latter point, the district court's conversations with the foreperson indicated that the jurors endeavored not to assume the external contacts' source. *See* Trial Tr., R.1055, PageID 8984. So the risk of bias appears less here than in other cases where our Court has

---

[7]*But see id.* (noting that "the implied-bias doctrine may not even be viable after" *Phillips*); *English v. Berghuis*, 900 F.3d 804, 816 (6th Cir. 2018) (collecting cases for same proposition).

declined to presume prejudice.  *See supra* p. 34 (collecting cases); *Pennell*, 737 F.2d at 529-34 (five anonymous calls threatening jurors to find defendant guilty); *United States v. Zelinka*, 862 F.2d 92, 93 (6th Cir. 1988) (threatening comment to jurors from spectator "who appeared to be associated" with the defendant); *Rugiero*, 20 F.3d 1389-90 (television report viewed by jurors that linked defendant's trial counsel to "'organized crime' figures").

To sum up, our precedents since *Pennell* instruct that defendants generally bear the burden of proving actual bias following external jury interference.  But "even if we assume" that courts can sometimes apply the "implied-bias doctrine," the defendants here have "failed to show that this is one of the 'extreme' or 'exceptional' cases that merit such a finding."  *Johnson*, 425 F.3d at 326 (quoting *Frost*, 125 F.3d at 379).  We thus decline the invitation to presume that the alleged jury interference was prejudicial and instead apply our precedents' prevailing actual-bias approach.

2

We now turn to reviewing the district court's finding of impartiality, bearing in mind that Smith and Baskerville were tasked with proving facts sufficient to demonstrate actual bias.

The district court's finding of impartiality is reviewed for abuse of discretion.  We will reverse the district court only if we are "*firmly* convinced that the district court erred," by, for instance, "bas[ing] its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence."  *United States v. LaVictor*, 848 F.3d 428, 440, 449 (6th Cir. 2017) (citation modified).  The upshot:  A "district court's finding of impartiality should not be disturbed absent a 'showing that prejudice is manifest.'" *United States v. Williams*, 195 F.3d 823, 828 (6th Cir. 1999) (citation omitted).

We've already explained why Smith's argument about individual questioning of jurors fails.  We've likewise noted that Baskerville *opposed* individual questioning and thus waived any claim to it on appeal.  Smith and Baskerville therefore must carry their burden of proving actual bias on the trial record as it stands.

The record evidence, though, uniformly indicates that the jury remained impartial. *First*, the jury foreperson repeatedly assured the district court of the jury's impartiality through two face-to-face interviews in camera. The district court credited the jury foreperson's account and concluded that "the jury" was not "improperly tainted." Trial Tr., R.1055, PageID 8978. The district court's assessments of demeanor and credibility warrant deference. *See Taylor*, 814 F.3d at 348-49. We see no basis to disturb them.

*Second*, the jury returned a split verdict that reflected a parsing of the parties' proof. As in other cases, the verdict undercuts any claim that the jury acted out of prejudice. *See, e.g.*, *Rugiero*, 20 F.3d at 1392 (concluding that jury's decision to "acquit[]" selected defendants "on three counts" shows that it "evidently disregarded any information" it may have heard from external news source); *United States v. Bradley*, 644 F.3d 1213, 1279-80 (11th Cir. 2011) ("That the jury fully acquitted some of the defendants and partially acquitted others provides" evidence that the jury considered "the charges individually and assess[ed] the strength of the evidence as to each charge." (citation omitted)).

*Third*, in response to the district court's poll, each juror swore that he or she voted "based on the facts, evidence, and law . . . and nothing else." Trial Tr., R.1056, PageID 9010-14. The district court was entitled to "rely upon" those assurances in rejecting defendants' request for a mistrial. *See Pennell*, 737 F.2d at 533. Here too, the district court's "determination regarding the credibly of jurors' assurances" receives "substantial deference on appeal." *Corrado II*, 304 F.2d at 604.

Given these facts, we are far from "*firmly* convinced" that the district court erred by engaging in a "clearly erroneous assessment of the evidence" on bias. *LaVictor*, 848 F.3d at 440, 449. The available evidence instead indicates that the jurors remained impartial. The allegations of external interference are troubling, to be sure. But "[d]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Olano*, 507 U.S. at 738 (quoting *Phillips*, 455 U.S. at 217). It instead necessitates "a jury capable and willing to decide the case solely on the evidence before it." *Id.* (quoting *Phillips*, 455 U.S. at 217). The district court did not abuse its discretion when it concluded—following its investigation and in-person assessment of the facts on the ground—that the jury met that constitutional standard.

IV

Baskerville next challenges the admission of "phone charts" illustrating communications between Junk Yard Dogs around the time of the six charged shootings. Baskerville Br. 11-12. The Government created the charts, which were offered and accepted into evidence over Baskerville's objection. Each chart depicts various Junk Yard Dogs members down the left-hand column using driver's license photographs. Then, using vertical lines to represent phone calls and text messages, the charts show when and how those gang members contacted each other around the time of the shootings.

Baskerville does not dispute that the charts accurately reflect underlying information from cell-site location data, text messages, and call logs. Nor does he contest the underlying phone records' admission into evidence at trial. Baskerville instead objects that the phone charts were improper and prejudicial summaries that should not have come into evidence.

We review the admission of summary charts under the abuse-of-discretion standard. *See United States v. Bray*, 139 F.3d 1104, 1109 (6th Cir. 1998). The same goes for Baskerville's challenge to the phone charts under Rule 403. *United States v. Harvel*, 115 F.4th 714, 736 (6th Cir. 2024). All of Baskerville's chart-related arguments fail.

*Improper-Summary Argument.* Baskerville first asserts that the phone charts reflected improper summary evidence. We disagree that the district court abused its discretion under the relevant evidentiary rules.

All agree that the phone charts constitute summaries of evidence already in the record. Such materials, often referred to as "secondary-evidence summaries," sit at the crossroads of Federal Rules of Evidence 611 and 1006. *Bray*, 139 F.3d at 1112; *see United States v. Kerley*, 784 F.3d 327, 341 (6th Cir. 2015). Rule 1006 allows district courts to admit summaries of evidence in place of the actual evidence itself. *Bray*, 139 F.3d at 1111-12. That's proper when the underlying evidence is admissible on its own terms, available to the opposing party, and too "voluminous" to easily examine in court. Fed. R. Evid. 1006; *see also United States v. Dunnican*, 961 F.3d 859, 873 (6th Cir. 2020). Rule 611, by contrast, allowed for the display of

"illustrations" like "drawings" or "graphs" that "simplify" admitted material—but these visual aids "are not themselves admitted" into evidence. *Bray*, 139 F.3d at 1112.[8]

Secondary-evidence summaries are a "hybrid" between both kinds of materials. *Kerley*, 784 F.3d at 341. These summaries visually simplify other evidence already before the jury—and are thus like the "pedagogical devices" that Rule 611 allowed. *Id.* But they also come in as evidence themselves to summarize underlying material—and are thus like the exhibits that Rule 1006 allows. *Id.* We've permitted district courts to admit secondary-evidence summaries upon two conditions. To start, the summaries must "accurately and reliably" present "complex or difficult evidence" already "received" in a way that "materially assists" jurors' understanding of it. *Bray*, 139 F.3d at 1112. In addition, the district court must provide a limiting instruction reminding the jury that the summary "is not" independent evidence, but instead "is only as valid and reliable as" the material "it summarizes." *Id.*; *accord United States v. Bailey*, 973 F.3d 548, 567-68 (6th Cir. 2020).

Baskerville takes no issue with those requirements. He does not now question the accuracy or reliability of the underlying cell-site-location, text-message, and call-log evidence. He does not contest the charts' graphical presentation of that evidence using the timeline format. He does not dispute the charts' ability to "materially assist" the jurors. *Bray*, 139 F.3d at 1112. Nor does he complain that the district court's limiting instruction was inadequate.

Rather, Baskerville's improper-summary argument boils down to the contention that the phone calls were "not so voluminous" as to warrant admission of the phone charts as secondary-evidence summaries. Baskerville Br. 12. But Baskerville points to no case, let alone a clear directive, establishing a minimum-volume requirement for the admission of secondary-evidence summaries. That failure to identify an "improper[]" or "erroneous" legal ruling alone forecloses Baskerville's contention on abuse-of-discretion review. *United States v. Metcalfe*, 581 F.3d 456,

---

[8]At the time of Baskerville's trial, Rule 611 governed the use of illustrative aids. Today, Federal Rule of Evidence 107, which took effect in December 2024, explicitly addresses the use of these demonstratives. Despite the change in rule number, the standard for illustrative aids remains the same. Courts may "allow a party to present an illustrative aid to help the trier of fact understand the evidence." Fed. R. Evid. 107(a). But those aids "[are] not evidence and must not be provided to the jury during deliberations" unless certain conditions are met. Fed. R. Evid. 107(b).

459 (6th Cir. 2009). But even if the volume of the underlying materials—in addition to their complexity—drove our analysis, Baskerville acknowledged to the district court that the phone records were "voluminous." Trial Tr., R.1049, PageID 8197. And for good reason: The underlying materials comprised "thousands of pages" of "phone records." Gov't Br. 79 (collecting testimony and exhibits). Applying Rule 1006, we have affirmed the admission of summaries of similar (and even smaller) "volumes" of evidence.[9] So Baskerville's summary-based argument does not support setting aside the phone charts' admission.

*Undue-Prejudice Argument.* Baskerville alternatively contends that the district court should have excluded the charts as "unduly prejudicial" under Federal Rule of Evidence 403. Baskerville Br. 11-12. That is so, Baskerville says, because the charts "led to [the] inference that all the people" on them "committed a crime whether present" at the crime scene "or not." *Id.* at 12. For support, Baskerville notes that the only defendant acquitted—Michael Hobson—did not appear on the charts.

Rule 403 provides a "balancing test for excluding relevant evidence." *United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018). That test, though, "is strongly weighted toward admission." *Id.* Under it, a district court should "exclude relevant evidence" only when "its probative value is *substantially outweighed* by a danger of . . . unfair prejudice." Fed. R. Evid. 403 (emphasis added). Unfair prejudice does not arise whenever evidence "provides powerful" proof of a defendant's guilt. *Harvel*, 115 F.4th at 737. More—like a tendency to drive the jury to convict on an "improper basis," such as a ground "different from proof specific to the offense charged"—is required. *Old Chief v. United States*, 519 U.S. 172, 180 (1997). District courts have "broad discretion in balancing probative value against potential prejudicial impact." *United States v. Carney*, 387 F.3d 436, 451 (6th Cir. 2004).

The district court did not abuse its discretion in balancing the prejudicial and probative value of the phone charts. Baskerville does not dispute that the charts conveyed the underlying

---

[9]*E.g.*, *United States v. Campbell*, 135 F.4th 376, 394 (6th Cir. 2025) (summary bar graph that compared a defendant's bonus earnings to others); *Bailey*, 973 F.3d at 567-68 (eight-minute summary tape of two hours of phone call recordings and seven hours of video recordings); *Kerley*, 784 F.3d at 341 (chart summarizing thousands of pages of evidence on eight separate real-estate transactions).

*and* unchallenged phone data "accurately" and "correctly." *United States v. Campbell*, 135 F.4th 376, 394 (6th Cir. 2025) (citation omitted). That phone data was itself "highly probative," *LaVictor*, 848 F.3d at 444: it confirmed that Baskerville communicated with the Junk Yard Dogs who carried out the six shootings on the nights in question. By synthesizing Baskerville's contacts with gang members into visual timelines, the charts "provide[d] powerful evidence" of the Government's theory that Baskerville directed and then kept tabs on the charged shootings. *Harvel*, 115 F.4th at 737. And even then, the district court's limiting instruction cautioned the jury that the chart itself "[was] not evidence of the material it summarizes and [was] only as valid and reliable as the underlying material." Trial Tr., R.1015, PageID 7065.

In short, the charts did not prejudicially link Baskerville to events in which he had no role. The charts instead helped explain the Government's theory about how Baskerville "committed the charged crimes." *Harvel*, 115 F.4th at 737. Their admission did not run afoul of Rule 403.

Hobson's absence from the chart and subsequent acquittal do not counsel differently. At the outset, linking convictions to the charts is faulty logic given that most of the depicted defendants pled guilty. Baskerville's argument also ignores that the jury acquitted Springfield of two of the attempted-murder charges, even though the chart depicted Springfield's phone activity and picture for both attempts. Nor was Hobson's absence from the phone charts the only factor separating him from Baskerville. Baskerville, as Chief of the Streets, led the Junk Yard Dogs; independent trial testimony established his role in eight attempted murders and two murders. Hobson, by contrast, was implicated in one murder and trial testimony cast some doubt on his presence at the crime scene. His acquittal does not change the Rule 403 calculus.

V

Lastly, Smith asks us to vacate his sentence under *Alleyne v. United States*, 570 U.S. 99 (2013), and order resentencing. According to Smith, the district court violated *Alleyne* by imposing a 10-year mandatory-minimum sentence on count five, his 18 U.S.C. § 924(c) conviction. As Smith notes, the district court imposed a 10-year mandatory minimum based on his discharge of a firearm in connection with the attempted murder of Willie Perry. But the jury

found only that Smith carried or used a firearm; as the verdict form for count five reflects, the jury expressly declined to find that Smith also brandished or discharged a firearm.

The Government acknowledges that Smith's use-or-carry conviction on count five should have generated only a 5-year mandatory-minimum sentence. *See* 18 U.S.C. § 924(c)(1)(A)(i). So it agrees that Smith's 10-year mandatory-minimum sentence for discharging a firearm violated *Alleyne*. And it accepts that a remand for resentencing is warranted. We therefore vacate Smith's sentence and remand for resentencing.

VI

For the above reasons, we **AFFIRM** the convictions of Baskerville, Springfield, and Smith. But, consistent with both sides' agreement that the district court erroneously imposed a 10-year mandatory-minimum sentence for Smith's firearm conviction, we **VACATE** Smith's sentence and **REMAND** for resentencing.